## THE PEOPLE *vs.* COLLINS.

This case came into the Supreme Court on reservation by the Presiding Judge of the Wayne Circuit Court, of the question whether " an act prohibiting the manufacture of intoxicating beverages and the traffic therein," approved Feb. 11, 1853, was constitutionally in force.

On this question the Court were equally divided.

Green, P. J., and Whipple, Martin, and Johnson, Judges, held the affirmative.

---

The People *vs.* Collins.

---

Wing, Pratt, Douglass, and Copeland, Judges, held the negative.

In the proposition that the power of enacting general laws cannot be delegated by the legislative body even to the people, all the Judges concurred.*

---

*SYNOPSIS OF THE OPINION OF GREEN, P. J.

1. It is only in the case of manifest assumption of power by the Legislature, and of clear incompatibility between the Constitution and a law, that the judicial power can refuse to execute the law.

2. By the Revised Constitution, all the Legislative power inherent in the People, became vested in the Legislature, subject only to the restrictions and limitations contained in the Constitution of the United States, and such other restrictions as the people deemed it proper to impose.

3. This power being thus vested, must remain there until constitutionally removed; and the Legislature cannot delegate it, and exclude itself from its exercise. It may, nevertheless, create subordinate bodies (such as private and municipal corporations) with certain powers of legislation, which it may recall at pleasure. It does not thereby surrender any of its own powers, but authorizes others to exercise, for the time being, powers which it might have itself exercised. It is in the very nature, therefore, of legislative power, that it may, at least to some extent, be delegated.

4. The sections 18, 19, and 20, of the act prohibiting the manufacture of intoxicating beverages, &c., providing for a submission to the people for their approval or disapproval, upon which it was to depend whether the act was to take effect upon a certain day or subsequently, is not a delegation of legislative power to the people. The act was complete as the express will of the Legislature, when it passed from their hands; nothing was to be added to or taken away from its provisions, by the people.

5. The act, like any other act made to take effect upon a future event, derives its force from the happening of such event; not by virtue of the event, but of the will of the Legislature, declared in anticipation of the event.

6. The Constitution contains no inhibition or restriction implying that the result of the popular vote upon the expediency of the law, may or may not be such a future event as the law can be made to take effect upon.

7. The submission of the act to the people, to determine its expediency, was a matter exclusively of legislative discretion; and this action of the Legislature, within the scope of its power, is not subject to review by this Court.

8. No express authority was conferred by the Constitution upon the Legislature, to require or authorize the Revised Constitution to be submitted to the people, but they were merely required by law to provide for calling a *conven-*

GREEN, P. J.

The only question presented for the consideration of the Court in this case is, whether the act of the Legislature, entitled "an act prohibiting the manufacture of intoxicating bev-

*tion to revise the Constitution.* The Legislature provided for calling such convention, and also for *a submission of the Revised Constitution to the people.* It was so submitted, and if the submission of this law to the electors made it invalid, the present Constitution must fall, upon the same principle.

9. The provision in the Constitution for the submission to the people of certain laws therein mentioned, implies no more than that the Legislature possesses the power in all cases, to be exercised or not, in its discretion; and that in some specified cases, it should be *imperative* upon them to make the submission. The Constitution sanctions such submission in some cases, and forbids it in none.

10. The words "to become a law," in the 20th section, were evidently intended to mean the same as "to take effect," or "be in force," the terms being used in the Constitution, and frequently in the statute, as convertible.

11. There is no adjudged case in which the distinction between those future events, upon the happening of which it is competent for the Legislature to make the taking effect depend, or those upon which it is not supposed to be so competent, is clearly defined.

12. The authority to sell intoxicating liquors, provided for in the act, does not amount to a license to sell, within the meaning of the Constitution. But if it were so, those provisions of the law might be regarded as independent, and be rejected as unconstitutional, leaving the other provisions to stand unaffected by their fall.

SYNOPSIS OF THE OPINION OF PRATT, J.

1. Sections 18, 19, and 20, of the act in question, are void, inasmuch as a: delegation of legislative power to the people, is thereby attempted.

2. The act in question is distinguishable from laws creating private or municipal corporations. The latter are special and local, and not of general character. The proceedings of corporators, to organize, constituting an acceptance of the act of incorporation, are not legislative acts. They do not determine the question whether the act of incorporation shall become a law, and when. Such laws are complete when passed by the Legislature, and being in the nature of a contract, it must be left to the corporators to determine whether they will accept them.

3. The act in question is also distinguishable from laws passed to take effect at some future time, upon the happening of some event, or not until some con-

44

The People *vs.* Collins.

erages, and the traffic therein," approved February 12, 1853, is unconstitutional.

To determine whether a co-ordinate branch of the government has usurped a power not conferred, or expressly and impliedly prohibited to it by the organic law, is one of the most

dition be performed; inasmuch as such laws are complete and positive in themselves, when they pass from the hands of the Legislature, and are not to become laws upon the decision of any foreign or extraneous power, upon the expediency of the law itself.

4. One or more sections of an act not connected with the other sections so as to affect them, may be declared void, leaving the remainder to stand good; but upon the provisions of this act for a reference to the people, the whole law depends for its efficacy and force; and these provisions of the act being void, the whole act is void.

5. The act is repugnant to art. 4, sec. 20, of the Constitution, which declares that "no law shall embrace more than one object, which shall be expressed in its title." It purports to be an act prohibiting the *manufacture* of intoxicating beverages, and the *traffic* therein.

6. It is also void for the reason that it embraces objects not "expressed in its title."

7. It is also void because contrary to the provisions of art. 4, sec. 47, of the Constitution, containing the prohibition—"the Legislature shall not pass any act authorizing the grant of license for the sale of ardent spirits, or other intoxicating liquors."

8. The provision of the 10th section of the act, "that unless the owner can show by *positive proof* that the liquors seized are of foreign production—that they have been imported under the laws of the United States," &c., is also void. It abrogates in this class of cases, fundamental principles of the law of evidence, and in effect prohibits the owner from making any defence whatever.

9. Section 10 of the act, in that it is retrospective, and operates to affect vested rights and past transactions, is in violation of sec. 10, art. 1, of the Constitution of the United States, and sec. 43, art. 4, of the Constitution of this State.

10. Upon the same fundamental principle, the first section of the act prohibiting the manufacture of spirituous liquors, is equally obnoxious and repugnant to the spirit of the Constitution.

SYNOPSIS OF THE OPINION OF MARTIN, J.

1. The maxim that delegated power cannot be delegated, is only true in its most general sense. "Although the Legislature cannot delegate its general

grave and delicate duties which a judicial tribunal can be called upon to perform.

In approaching a question of so much magnitude, it is important that we keep steadily in view the true subject of inquiry, and the settled rule which should guide us in arriving

legislative authority, it may authorize many things to be done by others, which it might properly do itself."

2. The restriction upon the right of the Legislature to delegate its power, is confined to the power of passing general laws, while in many instances it may confer local, special and administrative legislative power upon corporations or individuals.

3. The power of the judiciary to determine upon the constitutionality of legislative action, is now firmly established, yet it is to be exercised with great caution, and only in cases of clear and undoubted conflict with the Constitution.

4. The law in question is a general law ; and it is conceded that if any power necessary to its perfect enactment, was to be exercised by the people, it is unconstitutional, both by the letter and spirit of the Constitution.

5. A statutory law "is the declared will of the Legislature, and pre-supposes the exercise of judgment and reason ; and if a general law, must be complete and absolute in itself, and not dependent for its enactment upon any other body, or tribunal, or person." The law in question does not, in any respect, fall short of this definition.

6. There was no law-making power conferred upon the people by the authority to vote, contained in this act. There was only in fact the creation of a contingency, and to do this the Legislature had the power. The words "this act shall become a law of this State," and "this act shall take effect and become a law of this State," afford no indication that the Legislature did not pass the law.

7. The Legislature cannot declare when an act shall become a law. It is absolutely such when it has passed through the forms of legislation and received the executive sanction. All the power the Legislature has in that respect, is to determine when it shall take effect. It may declare the event upon which the time of its taking effect shall depend, and it may likewise create a contingency upon which the act shall take effect.

8. By the words "this act shall be submitted to the electors of this State for their approval or disapproval," no legislative power was delegated.

9. The authority of the case of Bartow *vs.* Himrod, (4 *Selden*, 483,) and its bearing, as adverse to the constitutionality of the law in question, denied.

10. The fair construction of the act is, that it should take effect like any other general law ; but that its fines and penalties should be suspended until the

at a conclusion. The question is one of power, and not of its abuse or indiscreet exercise. The Legislature may have acted very unwisely, and departed in our opinion, very widely from that line of policy which the interest of the State demands; yet if they have acted within the scope of the powers conferred upon them by the Constitution, this tribunal has no authority to nullify their acts, or to restrain the free exercise of their legislative discretion. The correction in such case must be administered by those who conferred the power, and to whom alone the individual members of the body are responsible for such unfaithfulness to the trust reposed. The rule which is to guide us in declaring whether an act of the Legislature is or is not unconstitutional, and which commends itself to the understanding of all, is clearly stated in the opinion of the Court in the case of the Cincinnati, W. & Z. R. R. Co. *vs.* Com'rs Clinton Co., (1 *Ohio, new series,* 77.) In that case, Ranney, J., says: "It is never to be forgotten that the presumption is always in favor of the validity of the law, and it is only when manifest assumption of authority and clear incompatibility between the Constitution and the law appears, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case. The Legislature is, of necessity, in the first instance, to be the judge of its own constitutional powers. Its

happening of the contingency contemplated, or the fixed period prescribed, as the event should determine.

SYNOPSIS OF THE OPINION OF DOUGLASS, J.

1. The power of enacting general laws cannot be delegated by the legislative body, even to the people, from whom all governmental powers originally emanated.

2. Sections 18, 19, and 20, of the act in question, are void, because of an attempted delegation of legislative power to the people.

3. Powers of local legislation, or rather powers of administrative legislation, are not within the principle, and may be delegated; neither are enactments in the nature of propositions, when mere acceptance calls the law in force.

members act under an oath to support the Constitution, and in every way under responsibilities as great as judicial officers. Their manifest duty is never to exercise a power of doubtful constitutionality. Doubt in their case, as in that of the Courts, should be conclusive against all affirmative action. This being their duty, we are bound in all cases to presume they have regarded it, and that they are clearly convinced of their power to pass a law, before they put it in the statute book. If a Court in such case were to annul the law while entertaining doubts upon the subject, it would present the absurdity of one department of the government overturning in doubt, what another had established in settled conviction." The first subject of inquiry relates to the character and extent of the power conferred by the Constitution upon the Legislature. That power is conferred by sec. 1, art. 4, in these words : "The legislative power is vested in a Senate and House of Representatives."

By this grant the whole law-making power of a free, sovereign and independent State, was transferred from the people in whom it resided, to the Senate and House of Representatives created by them, subject only to the limitations and restrictions contained in the Constitution of the United States, and such as they deemed it proper to impose. Whatever legislative power was inherent in the whole body of the people in their primary capacity, subject only to the limitations aforesaid, became thereby fully and exclusively vested in the legislative body, and whatever the whole people of the State might have done directly in their legislative capacity as a State, the legislative body may do in their name and on their behalf, within the prescribed limits.

The people at large have divested themselves entirely of all legislative power, subject to be recalled or controlled by them only in the mode provided by themselves in their Constitution of government. They have done this by using the most general and comprehensive language, and with-

out any attempt to define it, or to specify the objects upon which it is to be exercised. It is not a mere delegation of power to an agent to act for and in the name of the principal, which the principal may exercise concurrently with his agent, and which the agent may at any time surrender into the hands of the principal at his discretion. It is an agency, but it is something more. It is an authority to exercise all that judgment and discretion which the principal might have exercised, without consultation with or in opposition to the will of such principal, and without being subject to any direct control by the grantor of the power. It is an incident to inherent legislative power that it may be delegated; that incident adheres to the power in the hands of the legislative department of the government, qualified and limited only by the express provisions of the organic law, and the nature of constitutional organization. Those in whom this power primarily resided, necessarily possessed the power to organize a Constitutional Government, and in doing so, to divide the powers of such government into such departments as they might judge best. It was competent for them to divest themselves of the right to exercise directly any of the functions of government. Not so, however, with the departments which they have created. The Constitution vests the power of legislation in a select body of men, and there it must remain until the Constitution itself is changed or abrogated. They have no authority to delegate *their* powers and exclude themselves from the right to their exercise. But it does not follow that they cannot create subordinate bodies with certain powers of legislation. No one doubts their power, without any special grant in the Constitution, to create municipal corporations, with the usual powers belonging to such bodies, among the most prominent of which, it will not be difficult to show, are those of local legislation. But these powers, the Legislature may recall or modify at their pleasure. They have not surrendered any

portion of t.eir own, but they have authorized others, for the time being, to exercise powers which they might themselves have exercised, and which st.ll resided in them.   Is it doubted that the powers alluded to are properly legislative?   The legislative department of the government cannot exercise any other than *legislative* powers, except in the cases expressly provided in the Constitution.   (*Article* 3.)   But the Legislature might have directly enacted the whole code of ordinances and by-laws which have been enacted by the Common Council of the city of Detroit, and published under the title of the " City Code," instead of conferring the power upon the Corporation to enact them.   Had that been done, it would have been done by virtue, only, of the legislative power.   As a matter of expediency it was delegated to the Corporation, but that does not change the character of the acts themselves.   They are called ordinances or by-laws, to distinguish them as local in their operation, but they have the same binding force and efficacy as laws or rules of action, as if they had emanated directly from the original fountain of power.   They bind the citizens and others within a certain locality, and many of them impose fines, penalties and forfeitures for their infraction.   It would seem to be sufficiently clear then, that it is in the very nature of legislative power, that it may, to some extent at least, be delegated, and that the maxim, *delegata potestas, non potest delegari*, has no application, as has been supposed by a learned Judge.   (*Bell, J., in Parker* vs. *Com.*, 6 *Barr.* 507.)   Having thus examined into the nature and character of the powers vested in the legislative department, I proceed to consider the grounds upon which the act in question is alleged to conflict with the Constitution.   The ground principally insisted upon in the argument, is, that by §§ 18, 19, and 20, provision is made for submitting the act to the people for their approval or disapproval, and that it is declared by the latter section, that if upon a canvass of the votes to be cast thereon, it

should appear that a majority had voted for its adoption, it should become a law of the State from and after the first day of December, 1853 ; but if a majority should be found to have voted against its adoption, it should take effect and become a law of the State from and after the first day of March, 1870, and it is claimed that this is an attempt to delegate legislative power to the people, which the legislature could not do. The objection that it is a delegation of legislative power is not in itself tenable, as I have endeavored to prove, and as appears very clearly to my mind. But it is insisted that the act of the people in voting upon the law, and expressing their approval of it, was one which entered into the making of the original law itself, and that the act of the Legislature under which they expressed their approbation was incomplete as a law, until it was perfected and vivified by their sanction, a mere dead body of clay until they breathed into it the breath of life. An attempt was very ingeniously made on the argument, to distinguish this act from that class of enactments which confer powers upon corporations and individuals, partaking of the nature of legislative authority. It was said that such enactments are complete when they emanate from the Senate and House of Representatives and receive the approval of the Governor : that they operate *propria vigore*, and that the acts which they authorize are of an administrative character, and are done under and in pursuance of the law which the Legislature has made. This, I apprehend, is the strongest and most plausible position that could have been taken by the counsel in opposition to the validity of the statute in question. It is readily conceded, that if it was incomplete, and did not express the perfected will of the Legislature when it came from their hands, it could not become so by the act of any other body.

This statute, upon examination, is found to contain the proper enacting clause, which is in the present tense; sections numbered from 1 to 17 inclusive contain provisions such as

the Legislature must be deemed to have regarded as adequate·
to accomplish the object expressed in its title, and section 21.
repeals all acts or parts of acts contravening its provisions..
There is no pretence that it did not pass through all the re-.
quisite forms of legislation, and it received the approval of
the Governor, and was duly published.

It was not contemplated that anything was to be added to,
or taken away from its provisions by the people.  If the
three sections relating to the vote of the people had been en-
tirely omitted, the act would have taken effect and become in·
force in ninety days after the adjournment of the Legislature,.
according to sec. 20, art. 4.   It is not disputed that the Legis-
lature may extend the time for the taking effect of a statute
beyond ninety days in their discretion, and it is admitted by
counsel, and conceded in all the adjudged cases in which the
question is discussed, that the Legislature has power to pass
an act, to take effect or not upon the happening of some fu-
ture event certain or uncertain.

What then is the substance and effect of the three sections in
question?  Simply that at an election to be held in June for that:
purpose, the electors should express their approbation or dis-
·approbation of the law.   If they should be found to have ap-.
proved it, then, that it should take effect and be in force from·
and after the first of December, 1853, but if they disapprov-.
ed it, that it should take effect at a later period specified.

As an act of the Legislature to take effect in future, it is.
difficult to perceive wherein it was incomplete, or in what:
respect it failed to express the perfected will of the Legisla-·
ture.   If it be said that the act had no force when it came
from the Legislature, but was to derive its energy from the
vote to be taken, the reply is that the vote was taken under
and in pursuance of the law, and the effect which is claimed
for that vote, is such only as is declared by the expressed
will of the Legislature, in the act itself; and it is only by
force of that will that it has any effect whatever.   It

45

derived force and energy from that voice in no other sense than any act, made to take effect upon a future event, derives its force from the happening of such event; nor can I perceive how the power conferred upon the people, to cast the vote, partakes in any degree of the character of legislation, any more than would any other event, upon the happening of which, the Legislature might have made the taking effect of the act to depend. In either case, the act is lifeless, until the event happens; and continues so if the event is uncertain, and never happens; but it is lifeless in accordance with the declared will of the Legislature; but upon the happening of the event in either case, the law takes effect, not by virtue of the event, but by virtue of the legislative will, declared in anticipation of the event.

But it is said by the Court of Appeals, in New York, in the late case of Bartow *vs.* Himrod, while "it is not denied that a valid statute may be passed, to take effect upon the happening of some future event, certain or uncertain," that "the result of a popular vote upon the expediency of the law, is not such a future event as the statute can be made to take effect upon, according to the meaning and intent of the Constitution." And why not? There is no express inhibition in the Constitution, and no particular language of that instrument is pointed out, which seems to import such a restriction. The Court say: "The event, or change of circumstances on which a law may be made to take effect, must be such, as in the judgment of the *Legislature*, affects the question of the expediency of the law; an event upon which the expediency of the law, in the judgment of the *law-makers*, depends. On this question of expediency, the *Legislature* must exercise its own judgment, and definitely, and finally, when the law is made to take effect upon the happening of such an event, the Legislature, in effect, declare the law inexpedient, if the event should not happen. They appeal to no other tribunal to judge for them in

relation to its present or future expedience. They exercise that power themselves, and thus perform the duty which the Constitution imposes upon them. Now, by this description of an event on which a law may be made to take effect, let the law in question be tested.

·The Legislature, in the exercise of a sound discretion, determine, and in effect declare, that in case of an affirmative popular vote, it is expedient that the act shall take effect at a certain time; but that, in case of a negative vote, it is inexpedient that it take effect until a future day, specified.

This conclusion is certainly inevitable, if we assume that the Legislature have acted in good faith; and we have no authority to assume the contrary. But if we were at liberty to inquire as to the probable motive which induced them to submit the law to a popular vote, in order to ascertain whether a majority of the electors of the State approved or disapproved of it, I apprehend that such course may be fully justified, on the ground of expediency. It was universally known and deeply felt, that the use of intoxicating drinks. was an evil of stupendous magnitude, which directly or indirectly affected the interests of every citizen. It had long been conceded by intelligent men, and was indisputably true, that the intemperate use of intoxicating drinks had been the cause of more crime, pauperism, suffering, and premature death, than all other causes together. All the efforts which had been made to suppress the evil by means of voluntary associations and obligations, had proved ineffectual, and an appeal was finally made to the Legislature, by great numbers of our most intelligent and patriotic citizens, to inhibit the manufacture of intoxicating beverages, and the traffic therein. That body may reasonably be supposed to have been willing to do whatever could be accomplished by legislation, and to pass a law to prevent the manufacture or vending of the poisonous fluids, provided such a law

could be enforced, and upheld by the public opinion. They could have had no doubt of the utility and expediency of destroying the gigantic destroyer, if the attempt could be made successfully. But large numbers were addicted to the daily habit of intoxication; still greater numbers used intoxicating liquors habitually, but more moderately; and very many influential men were engaged in their manufacture or sale. Large amounts of money were invested in fixtures and machinery for such manufacture, which would become valueless, or nearly so, in case the business should be suddenly inhibited. Many good citizens, who were willing to make great exertions to persuade others voluntarily to relinquish the manufacture of, or traffic in, such beverages, were still sensitive upon the subject of coercion, and might not be willing to support a law for that object. The expediency of the proposed law depended upon the fact, not known to the Legislature, whether a majority of the citizens entitled to vote at elections, were in favor of it. If a majority should express their approbation of the law, then the *Legislature* judged it expedient that the law should take effect at an early day, specified, concluding that in such event, the law would be sustained and enforced ; but if a majority should disapprove, then *they* determined that it would be inexpedient, and that it should not take effect until a later day. The submission was a matter exclusively of Legislative discretion, and the action of the Legislature within the scope of its powers, is not subject to review by this tribunal. The propriety or impropriety of making a law take effect upon the happening of any particular future event, can only be determined by the law-making power. We have no right to oppose our peculiar opinions of propriety or expediency to theirs, in matters not clearly beyond the pale of their authority.

The case of Parker *vs.* Com. (6 *Barr.* 507,) and that of Rice *vs.* Foster, (4 *Harr. N. J.* 476,) were also cited,

and much relied on by the counsel for the defendant.   The former case involved the question whether an act authorizing a vote to be taken in the several boroughs, wards and townships, at the annual election of constables, &c., to decide by their votes whether or not the sale of vinous and spirituous liquors should be permitted among them, for the ensuing year.   If the vote was against the sale, no license was to be granted the ensuing year; if in favor of the sale, then the laws in force, regulating the business of inns, &c., were to remain in force.   This law was held unconstitutional, (two of the five Judges dissenting,) on the ground that it was a delegation of legislative power, because, as was assumed, the force and effect which it undertook to give to the vote of the people, was a suspension or repeal of the *existing laws*, regulating the granting of licenses for the sale of liquors; under that act the law, it was assumed, might be changed from year to year, in each of the districts over which it extended, by the action of the people therein, and without any regard to the legislative will.

In order to distinguish that case from the one under consideration, it is only necessary to quote the language of the same learned Judge in the case of the Com. *vs.* Judges, &c., (8 *Barr*. 395.)   Referring to the former case, he says: "It settled nothing more than that the general assembly of the Commonwealth cannot delegate to the people a power to enact laws by the exercise of the ballot, affecting the property and binding the political and social rights of the citizens."   If it be conceded that this principle is true, and that it was applicable to the case in reference to which it was declared, it does not apply, as I have attempted to show, to the case before this Court.   The case of Rice *vs.* Foster involved a similar question, and was decided upon similar grounds, with the case of Parker *vs.* Commonwealth.

The question in the case of the Commonwealth *vs.* the Judges, &c., was whether it was competent for the Legis-

lature to submit to the qualified voters of a new township, whether it should be continued or annulled. This was held to be constitutional. Bell, J., in delivering the opinion says, " the erection of a township, or the creation of a new district for merely municipal purposes, or convenience in the transaction of the public business, is in no degree similar to the exercise of law making power. The one is an exercise of sovereignty, the other in its very nature a subordinate function." " The power of the Legislature directly to repeal that action cannot be questioned," says the Judge, ." and that which they could do immediately may also be effected by the means of a popular vote." I have no doubt of the soundness of the decision in that case, but that the vote of the electors which annulled the new township, and reunited it with the one from which it was erected, is not similar to the law making power, I cannot concede. Had the general assembly accomplished the same thing, as it might have done by the passing of an act for that purpose, it would have been done *solely* by the exercise of the *legislative* power. But the same thing was done, with precisely the same effect in all respects, by virtue of a delegated authority. Where, then, is the substantial difference in the *character* of the act, whether effected by direct or indirect agency.

A different view, it appears to me, might have been taken of the legislative enactment under *which* the vote was taken, which would have obviated all difficulty. The act was complete, as a constitutional declaration of the legislative will, when it passed from their hands to take effect upon a future uncertain event, to wit : an affirmative vote of the qualified electors.

Very many cases were referred to upon the argument as illustrating the doctrine in question, but one of which I propose to notice at length, and that I regard as a perfect parallel in principle to the one at bar. Article 13 of the Constitution of 1835, under which the State was organized, pro-

vided the mode of amending or revising it. Sec. 2 of that article authorizes the Legislature, in the case therein specified, to provide by law for calling a Convention to revise or change the entire Constitution. By an act approved March 9, 1850, the Legislature made provision by law for calling a convention to revise the Constitution, and that the said revision should be submitted by the convention to the people for their adoption or rejection, at such time and in such manner as the convention might prescribe. (*Laws* 1850, *p.* 64, *&c.*) No express authority was conferred by the Constitution upon the Legislature to require or authorize the revision to be submitted to the people; but they were required to provide by law for calling a *convention to revise the Constitution.*

That convention, acting under the statute, made provision for submitting their revision to the electors of the State, and if a majority should vote in favor of its adoption it was to take effect on a certain future day, but if a majority should vote against it, it was to be null and void. Was the new Constitution so adopted, the act of the electors or of the convention? If it was the act of the former, (and it could not take effect by its own provisions without their adoption of it,) then it never became "*the supreme law of the State,*" for the Constitution could be revised only in pursuance of the provisions which it contained, and that power was conferred upon the *convention*, and not upon the people. If, therefore, the law relating to the manufacture and sale of intoxicating beverages is unconstitutional because it was submitted to the people for their approval or disapproval, the new Constitution must fall by the same principle. If the vote of the people in the former case was a legislative act, it was eminently so in the latter. If the power was such as could not be delegated in the former, it was emphatically so in the latter case. But the one was the perfected will of the Legislature and the other of the convention, to take effect or not upon the happening or not happening of a future uncertain event, *by vir-*

*tue of the same will;* not by *virtue* of the event, but as a predetermined and predeclared *consequence* of it.

It was suggested upon the argument that sec. 2 of art. 15 of the Constitution forbids, by implication, the submission of any other laws than such as are mentioned therein, to a vote of the electors.   That section is as follows : " No banking law, or law for banking purposes, or amendments thereof, shall have effect until the same shall, after its passage, be submitted to a vote of the electors of the State at a general election, and be approved by a majority of the votes cast thereon at such election."   This language does not warrant any such construction ; on, the contrary, if any implication is to be drawn from it, it is that the Legislature possesses the power in all cases, to be exercised or not in their discretion, and that in the cases specified it should be their imperative duty to make the submission.   It is not the form of language by which a power is conferred, but that in which a limitation or restriction is imposed.

Some stress was also laid upon the particular phraseology of that portion of the 20th section of the act in question, which provides that if a majority of the electors should approve the act, it should " become a law," &c.   To " become a law," as there used, evidently was intended to mean the same as " take effect," or, " be in force."   These terms are used in the Constitution, and frequently *in statutes*, as convertible, and the use of the former by the Legislature instead of the latter, affords no ground for assuming that the vote of the electors was regarded as necessary to make it a complete enactment. Before leaving this branch of the argument it may be observed, that in no adjudged case to which we have been referred, nor in any one which my researches have enabled me to find, is the distinction between those future events upon the happening of which it is competent for the Legislature to make the taking effect of a law depend, and those upon which it is not supposed to be so competent, clearly and intelli-

gibly laid down, or really attempted to be defined. Chief Justice Ruggles, in the case of Bartow *vs.* Himrod, seems to shadow forth a distinction between an intelligent act, proceeding from reflection and judgment, or choice in the actor with reference to the propriety or expediency of the law itself, and such as proceed from different causes and have no reference to the character of the law, and to suppose that a law is unconstitutional in the former case but not so in the latter. It was assumed in that case that "the event on which the act was made to take effect, was nothing else than the vote of the people on the identical question which the Constitution makes it the duty of the Legislature to decide;" "that the Legislature had no power to make an act dependent upon such a contingency, *because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and which they cannot delegate or commit to any other man or men to be exercised.*" If the premises were sound there might be some force in this assumption, and the reason assigned for it might be regarded as plausible, but I have shown, to my own satisfaction at least, that Legislatures have always exercised the unquestioned right to delegate large and important legislative authority to other men, and that in the passage of laws of this character they exercise full and complete legislative discretion. But if such an assumption were admitted it would annul the Constitution of 1850, and would sweep from the statute book every act of incorporation, whether for public or private purposes. Considering it as a question of *power alone*, I can see no possible ground, either in the Constitution or in reason, upon which to base any such distinction. In the case of a banking law, the convention deemed it of so much importance that the people should be consulted, that they expressly required its submission to a popular vote, and that it should not take effect without the approbation of a majority. The law under consideration is one of at least equal importance, and as strong reasons may exist for sub-

46

mitting it for the approval of the electors as in the case of a banking law. The Constitution sanctions the *principle* of doing so in important cases, and forbids it in none. Like all other powers it is liable to be abused, but that is no evidence that it does not exist. It seems strange to me that any such distinction should be supposed to exist between an event produced by the intelligent action of those who are directly interested, and which may well be presumed likely to lead to a wise and judicious result, and an event which may be controlled by a hostile interest, or arise from an unintelligent cause.

But it was said that when the vote was taken the act had not taken effect, and by its terms could not be in force until the second day of December last, whereas the vote was cast in June. The three sections relating to the vote, by necessary implication and clear intendment, took effect at the expiration of ninety days from the close of the session, and before the holding of the election. In that respect they are as distinct and separate from the other portions of the law as if they had been separately enacted, and I apprehend that for every purpose they may be treated and construed in the same manner as if they constituted a separate law. As a separate act they would have had the same effect, and no other, upon the other provisions of the act that they now have. If they would have been unconstitutional, they are so now; and if they could be rejected as independent, so may they now. But according to the view taken of the principal question, it is unnecessary to express any opinion upon this point.

The provisions of the statute relating to the sale of spirits, wines, or other intoxicating liquors, to be used for mechanical and medicinal purposes, it is claimed, are in conflict with sec. 47, of art. 4 of the Constitution, which inhibits the passing of any act by the Legislature, " authorizing the grant of license for the sale of ardent spirits, or other intoxicating liquors."

For many years prior to the adoption of the present Constitution, a system of licensing has prevailed, under which persons were allowed, upon the payment of the required fees, and receiving a written authority from the proper board, to traffic in intoxicating liquors, for their own individual benefit. This was known as the license system; and while it was made a source of public revenue, it threw around the traffic the sanction and protection of the law, and, as far as such countenance and protection could do, made it a legitimate and respectable business. While thus sustained by the law, and stimulated by cupidity and avarice, few there were who would listen to the friendly voice of warning and admonition, or allow themselves to reflect upon the dark catalogue of woes, that were likely to flow from an indiscriminate sale of intoxicating drinks. It was this "system," at which the constitutional provision was aimed, and which it was designed to put an end to. It was the encouragement which it afforded to the use of intoxicating drinks as a beverage, that the Constitution intended to take away. The language used by the framers of the Constitution sufficiently indicates their intent. They inhibit the license of the sale of "ardent spirits or other *intoxicating* liquors." Why are they designated and characterized as *intoxicating* liquors, except with reference to their use for the purpose of intoxication, or as a drink or beverage? Because it was only by reason of such use that they were injurious; and their sale ought not to be countenanced by law.

The authority to sell, provided for by the act in question, may, within the most strict and literal meaning of the term, amount to a license to sell; but I am inclined to the opinion that it is not so, as the term is used in the Constitution. But even if it were so, I should have no hesitation in holding that it would not vitiate the inhibitory provisions of the law, but that they might properly be regarded as distinct and independent, and might be rejected \as unconstitutional, leaving the other provisions to stand unaffected by their fall.

PRATT, J.

The only question presented for decision in this cause is, whether the act of the last session of the Legislature, entitled "an act prohibiting the manufacture of intoxicating beverages and the traffic therein," is a valid subsistent law of the State, or whether it is repugnant to the Constitution, and therefore void.

It is true, as contended by the learned counsel for the people in this cause, that a Court whose duty it is to decide on the validity of an act of the Legislature, should proceed to do so with care and due deliberation ; yet when the question arises, and it is legally submitted for decision, it is as much the duty of the Court to decide it as it would be to decide any other legal question presented in a cause. In deciding this, or any other legal question, the Court should act independent, and without the least reference to parties, counsel, or any surrounding extraneous influences that may exist, whether of a political or a religious character ; otherwise the Court would act corruptly, and in deciding become morally perjured, and entirely unworthy of occupying a judicial station.

That the act of the Legislature referred to is a most flagrant violation of the Constitution and our representative system of government, I, as one member of this Court, do not, and cannot entertain a doubt ; and the more I have investigated the subject, by the most deliberate and attentive examination of it in all its bearings, the more have I been confirmed in this view—a view which I originally took of the act while it was pending in the shape of "*a bill*" before the Legislature, and but a few days before its passage by that body.

When the electors of this State adopted the present Constitution, they acted in their collective and sovereign capacity, under the restrictions imposed upon them by the Constitution of 1835, and the laws then in force which had

been enacted under it.   The adoption was the exercise of sovereign power by them as a collective body.   In exercising that power collectively, each elector was at the same time a subject of t'ie former Constitution, and all the laws of the State then in force.

By the adoption of the present, the former Constitution was done away with, and the subjection to the former was changed to a subjection to the present Constitution, which has been, by the electors themselves, solemnly ordained as the supreme law of the State ; and by its provisions the Executive, Legislators, Judges, and every other officer and citizen of the State, are legally and firmly bound.

By the Constitution, (*article* 3, *sec.* 1,) the powers of the government are divided into three departments : the Legislative, Executive, and Judicial ; all general governmental powers, therefore, must be exercised by these departments. "The Legislative power (*art.* 4, *sec.* 1,) is vested in a Senate and House of Representatives." Thus the *law making* power is expressly vested in the legislative department.   There it was deliberately and intentionally placed by the collective vote of the electors themselves, when acting legitimately in their collective sovereign capacity, and there, and there only, must this general *law making* power remain and be exercised for weal or for woe, until the government is changed by revolution or by another act of the collective sovereignty in the manner pointed out by the Constitution itself, for legislators, when acting in their legislative capacity, are as much the legal subjects of the provisions contained in it, as any other citizens of the State.   They have been legally made such subjects by its adoption as the fundamental law, and the acceptance of official trusts under it.   And no act of theirs can legally override it, or sunder their bond of subjection to its requirements.   Nor can any legislative act of theirs be rendered valid by any process or proceedings whatever, unless such act is in accordance with its provisions.

This is not a new doctrine ; it is the same which has been held since the establishment of constitutional representative governments on this continent. It is the doctrine of states- men as well as jurists, that the Legislature is the creature of the Constitution. It owes its existence to that instrument, and derives all its law making powers from it. The Con- stitution is the expressed will of the sovereign, specifying and establishing the limits of its law making powers ; the man- date of the creator, directed to, and obligatory upon the creature and its authority, is absolute and supreme in the State. By this soverereign mandate, the power of making all general laws for the State, is expressly and exclusively conferred upon the legislative department. When the elec- tors by their collective vote, adopted the Constitution as the sovereign law of the State, they not only legally divested themselves of all power collectively to legislate or make laws, but they unconditionally and legally surrendered up that entire power to the legislative department of the government, reserving to themselves the single right of legislating by their collective vote, on any *banking act* thereafter passed.

The law-making power, thus exclusively conferred upon the Legislature, with the exception of the single reservation named, is absolute and unconditional; and it cannot, by that body, be delegated back again to the electors, to be by them exercised collectively, or otherwise than through their legally constituted representatives in the Legislature; nor can they claim the power, or exercise it, any more than any other class of citizens, without an open violation of the Constitu- tion, and a base perversion of our representative system of government.

There is no proposition more clear, and no principle more plain or certain, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. And it has been well said, by one of the ablest statesmen that this country ever produced, that "no

legislative act, contrary to the Constitution, can be valid; and to deny this would affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men, acting by virtue of special powers, may do, not only what they do not authorize, but what they forbid."

It is, beyond all question, well for the stability and safety of the government, as well as for those rights, privileges, and institutions which have been established under it, that this *law-making* power, the most important of all governmental powers, is absolute and unconditional; that it cannot be delegated by a Legislature at will, or whenever a majority of the members of that body may be disposed corruptly, or for want of moral courage, to avoid legislative responsibility.

This sovereign law of our constituted system of government, says that the Legislature shall make the laws for the State; that this, and this only, is its legitimate business, as a distinct branch of the government. But the members of this constitutional body meet and say, we will not be governed by the expressed will of the sovereign; we will not take upon ourselves the responsibility of making all laws; we will not so far risk our political reputation and standing; but will delegate our legislative authority back again to the electors, to pass or reject, by their collective vote at the ballot box, certain *bills*, before us. A majority of the electors sanction such an unauthorized proceeding on the part of the Legislature, and without any alteration of the Constitution, arbitrarily adopt and establish this practice as constitutional legislation—as a constitutional mode of enacting general laws for the State. The question is taken to the Court of last resort, whose duty it is, under the Constitution, to determine the question; but the members of that Court are unable to agree, being equally divided; so that no affirm-

ative decision upon it can be made. In view of such a state of things, what is to be the final result and end of this kind of legislation? Our boasted system of representative government is to be perverted, and a *collective democracy*, the most uncertain and dangerous of all governments, to be arbitrarily substituted in its stead. Such must be the inevitable result and end of such legislation; for if the Legislature can take this step, and pass one law in this way, it can, beyond all controversy, pass every other law in the same way. The legislative department of the government, therefore, instead of being the law-making power, under the Constitution, becomes a self-constituted body, merely to frame bills for the electors of the State, *collectively*, to pass or reject, by a vote at the elections, and as they may from the spur of the moment, or without much thought or reflection, deem proper.

Can it be possible that any man of mature years believes that, under our representative system of government, statute laws can be constitutionally enacted in this way? And can it be possible that any American citizen, out of a mad house, is desirous even in a legal manner of establishing in this country such a system of government?

This is not an imaginary view, or a hypothetical representation of a state of things which does not exist; on the contrary, just such a state of things does actually exist at the present time in this State. Is it not so? The act under consideration prohibiting the manufacture of intoxicating beverages and the traffic therein, passed in this manner, is, nevertheless, claimed to be a valid and subsistent law of this State, and numerous prosecutions have been instituted under it.

The Constitution (*art.* 4, § 20) expressly provides that "no public act shall take effect or be in force until the expiration of ninety days from the end of the session at which the same is passed, unless the Legislature shall otherwise direct, by a two-thirds vote of the members elected to each house."

If the act in question is, as claimed, a valid and subsistent law of the State, then, under this provision of the Constitution, it must have been fully enacted by the Legislature, so that when it came from the hands of the Executive with his approval, it was, in virtue of its own provisions, an absolute act, which would take effect and become operative as a law, at a time fixed and in terms expressed by the Legislature, or at the expiration of ninety days from the end of the session, without any further action upon it, otherwise it cannot be a valid law.  But the act did not take effect and become a law at expiration of the constitutional limit, nor was it possible; for the Legislature otherwise expressly determined, nor did the Legislature intend that the act should, without further action upon it, take effect and become a law at any time.  This is not an implied view; on the contrary, this intention is clearly and fully expressed on the face of the act, and so clearly and so fully expressed that it cannot be misunderstood, or the language perverted by construction or sophistical reasoning.

By the *eighteenth* section of the act, the Legislature says, " this act shall be submitted to the electors of this State for their *approval or disapproval*, on the 3d Monday of June in the year of our Lord 1853, when there shall be an *election* held for the purpose in each of the townships, cities and villages in the State," &c.  By the *nineteenth* section, the Legislature says, that " at said township, city, or village elections, a ballot box shall be kept by the several boards of inspectors thereof, for receiving *the votes cast for or against said law;* and on the ballot shall be written or printed the words, " Adoption of the law prohibiting the manufacture of intoxicating beverages and the traffic therein, Yes ;" or the words, " Adoption of the law prohibiting the manufacture of intoxicating beverages and the traffic therein, No." And by the *twentieth* section, the Legislature after making provision for the return and canvass of the votes cast, &c., says that " if it

47

shall appear that a majority of the votes cast have thereon, 'Adoption of the law prohibiting the manufacture of intoxicating beverages and the traffic therein, Yes,' this act shall become a law of the State from and after the first day of December 1853 ; but if a majority of the votes cast upon the question, have thereon ' Adoption of the law prohibiting the manufacture of intoxicating beverages and the traffic therein, No,' this act shall take effect and become a law of the State from and after the first day of March, 1870."

This language is not in the least ambiguous, but entirely plain and explicit, and by the use of it the Legislature has, in terms, said that it did not intend to have the act go into operation as a law at the expiration of ninety days after the end of the session, or at any other time, without further action upon it; and this must, as appears to me, be evident to the understanding of the most ordinary mind.

And it is equally as clear that the Legislature did not regard it a law when it left that body, although it had the approval of the Executive. The language of the Legislature in the 20th section is, "if it shall appear that a majority of the votes cast, &c., have thereon, yes, this *act shall become a law,*" but not without ; and the words used will bear no other construction. If the Legislature did intend, notwithstanding its expressed intent to the contrary, to have the act take effect and become operative as a law of the State at the expiration of ninety days after the end of the session, without any other action to give it vitality, then it is clear that the Legislature was guilty of perpetrating a most villainous fraud on the people by requiring them, after the act had become a law under the constitutional limit, to hold a special election throughout the State for the sole purpose of having the electors *collectively* determine, by vote, whether it should become a law or not, and that, too, at a sacrifice of time and expense of at least twenty-five thousand dollars. But there is no room for such an inference, as the real intent of the Legislature is

plainly written on the face of the act. Besides, it was distinctly understood, both before and at the time of the election, by every adult citizen in the State, that this special election was authorized by the Legislature for the sole purpose of enabling the electors to pass the act into a law, to take effect on the first day of December, 1853, or to reject it by their collective vote. And the electors went to the polls and voted with that distinct understanding, and no other.

What was it, then, that put the act in force on the first day of December last? Was it the intent and action of the Legislature, or was it the intent and *legislative action* of a majority of the electors who voted upon it? It was clearly the intent and *legislative action* of the latter; for the former expressly and distinctly said, that it did not intend to have the act become operative as a law, without the expressed intent and *legislative action* of the latter upon it. It therefore follows, as a legal consequence, that this law was not made operative by the Legislature, under the Constitution, but was enacted and put in force by the *legislative action* of the electors, collectively, through the medium of the ballot box. Is it not so? Suppose a majority of the electors, at the special election, had voted, " adoption, &c., no;" would the learned counsel for the people have still contended that the act was, nevertheless, a valid and subsistent law of the State? Would any sane man have believed such an absolute absurdity? Again : suppose that the vote at the election had been a *tie vote*—the act neither " adopted" nor " rejected," by the electors. That clearly would not have been a *contingency* provided for by the Legislature; and would the act still have become operative as a law on the first day of December, 1853? I apprehend that no man, unwilling to stultify himself, would have attempted to maintain the affirmative of such a proposition. And yet, if it would not have been a law, then the conclusion is irresistible, that it was made a law by the electors, and not by the Legislature. Because, if

the act had the legal vitality of a law, although to take effect in future, when it came from the Legislature, the electors at the polls, voting on it "yes," or "no," or otherwise, a thousand times, could not have destroyed that legal vitality.

But it is contended on the part of the people in this case, that the Legislature has the power to pass an act conditionally, requiring the electors of the State to determine by vote at an election, whether such act shall become a law or not; and that there is nothing in the Constitution prohibiting the Legislature from the enactment of laws in this manner. This, to me, is even more extraordinary and absurd, if possible, than the despotic provisions incorporated into the act. This legal proposition of the counsel, then, must be based upon the silence of the Constitution in this respect; hence the omnipotent legislative power contended for, must be an implied power; and if the Legislature, by implication, can delegate to the electors its legislative functions, conferred by the Constitution, and thus empower them to determine by ballot, whether an act framed by the Legislature, and sent to them, *still born*, shall remain lifeless, or whether they shall breathe into it *legislative breath*, and thereby give it legal vitality, as a valid law of the State; then, the Legislature can also, by implication, delegate its legislative functions, for the same purpose, to the colored residents of the State, or to the convicts in the State prison; but the doctrine is unsound, and cannot be legally sustained.    It is destructive of a fundamental principle of construction, and subversive of our constituted system of government.

A fallacy, strange indeed, must have crept into the heads of those who attempt to maintain the affirmative of this doctrine.  It is true, as an established principle, which has ever been conceded and never disputed, that legislative power is a grant from the sovereign—the electors of the State ; and that the Legislature, unless restricted by the Constitution, possess every necessary power to legislate, except those del-

egated to some other department, or expressly reserved by the sovereign. The Constitution (*art.* 4, *sec.* 1,) expressly says that " the legislative power is vested in a Senate and House of Representatives." What is this legislative power thus expressly vested by the Constitution? It is simply the power of enacting within the limitation, restrictions and reservations of the Constitution, all suitable and necessary laws for the people of the State. This, and this alone, constitutes legitimate legislation. But the Legislature, delegating its legislative powers to the electors, or any other body of men, to legislate in its place and stead, is not an act of legislation, nor can it, upon any principle of construction, be so considered. Nor can the Legislature, by implication, and without express authority in the Constitution, any more delegate its legislative powers for any purpose than an agent can appoint another to act in his place and stead, by implication and without authority from the principal.

The Constitution (*art.* 15, *sec.* 2,) expressly provides " that no banking law, or law for banking purposes, or amendments thereof, shall have effect until the same shall, after its passage, be submitted to a vote of the electors of the State, at a general election, and be approved by a majority of the votes cast thereon at the election." By this plain provision, the electors of the State expressly reserved to themselves the right to legislate collectively on that one specified subject. This one right being expressly reserved, it follows, by all sound rules of interpretation, that they did not intend to reserve the right of legislating collectively upon any other subject, and therefore cannot exercise the right. Independent, however, of all rules of construction heretofore established, this express reservation by the electors, clearly demonstrates the view here taken, for it would be absurd and senseless to have expressly reserved from the grant of power, that which otherwise would not have been granted. What is a legislative act? It is the will of the Legislature, and the Constitu-

tion is its commission for the official expressions of such will. Was it the will of the Legislature, or the will of the electors, that put the act under consideration into operation as a law of the State, on the first day of December, 1853? It was beyond all cavil or controversy, the will of the latter ; for the Legislature expressly left this question to be determined by their will alone, and it is upon the expression of their will through the ballot box, that the act has been claimed and proclaimed, to have been made operative as a law. The act, by the words of the vote expressly prescribed, was by the Legislature, submitted to the electors for their " *adoption*," and if adopted by them, it was to " *become a law of the State from and after the first day of December*, 1853 ;" not that the law was to take effect on that day, but the act to *become a law* on that day. From this language it is manifest that the Legislature did not consider this act, when submitted to the electors, as a law *in præsenti*, to take effect *in futuro*, and we have no right to pervert the language used by the Legislature in order to give validity to the act. But did the Legislature exercise its legislative judgment, as the *law making power* of the government on the question of the *expediency* of the act going into operation as a law upon the first day of December, 1853? Clearly not ; otherwise, why leave that question of *expediency* to the electors for their judgment and determination? The question of expediency is a very important and vital question in legislation, and which the Legislature alone has the power to settle.

The adoption of the Constitution by the electors, was, in legal contemplation, the establishment of it as the fundamental law of the State. And was not such an act of adoption legislative in its character, and to all legal intents and purposes? And was not such an act of adoption an exercise of judgment upon the expediency of the act in question? Could the Legislature have supposed that the electors of the State were without mind, and that in the submission of the act

to them for their adoption or rejection, they would go sense-less to the polls and vote, without exercising their respective judgments, as to the expediency of establishing it as a law of the State? Certainly not, for it was the exercise of their respective judgments upon this question, that the Legislature demanded of them ; it was, therefore, legislative action, and the exercise of legislative functions in the settlement of the question of expediency which was required—a question which it was the imperative duty of the Legislature to have settled, but which for some reason not expressed in the act, that body declined doing. If this system of legislation is to be toler-ated, then, inevitably, there will soon be an end of all rep-resentative responsibility to the people.

Notwithstanding this wild theory of general legislation is of recent origin in this country, we are not without judicial decisions upon it.

In Maize *vs.* the State,* which was a prosecution under the *Liquor Act* of Indiana, for retailing spirits without a license, the question submitted and determined by the Court, was, " Is the act of March 4, 1853, or so much thereof as requires it to be submitted to the people of the several townships, constitutional?" The Court declared the act unconstitutional, on the ground that "the act was made to depend, for its vitality and effect, upon authority unknown to the Constitu-tion, and independent of the will of the Legislature." In the opinion delivered in the case, the Court says : " If the people collectively are determined to claim and exercise the law-making power, which they have expressly delegated to the legislative department of the government, let them proceed legally to change the Constitution—the system of government which has been by them in the most solemn manner adopted." In Bartow *vs.* Himrod, (4 *Selden*, 483,) the act known as the Free School Act, in the State of New York, submitted by the Legislature to the people, to determine wheth-

*Since reported, 4 Ind. R. (Porter,) 342.

er it should become a law or not, was, by the Court of Appeals, the Court of last resort in that State, declared unconstitutional and void. The case was decided on the broad ground that the legislative power is vested by the Constitution, in the Legislature. In one instance only, says the Court, is this power limited or qualified, and that is—" No law for the contracting of a public debt, shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast at such election." In this special and single case, the people, by the Constitution, reserved legislative power to themselves. The Legislature pass the bill in the usual form of enactment, but the statute has no force or authority until it is sanctioned by a vote of the people. The exercise of this power by the people in other cases, is not expressly prohibited by the Constitution, but is by necessary and unavoidable implication, forbidden. The Senate and Assembly are the only bodies of men clothed with the power of general legislation. They possess the entire power, with the exception above stated, and the people reserved no part of it to themselves, excepting in regard to laws creating public debts, and cannot, therefore, exercise it in any other case." In the course of the opinion delivered in this case, the Court further says: " If the legislature cannot delegate to an individual the authority to determine, by the mere exercise of his judgment, whether a statute ought to take effect or become a law, it follows, as a necessary consequence, that it cannot be delegated to the whole people."

In the case of Bradley *vs.* Baxter, another case under the free school act of New York, (15 *Barb. S. C.* 122,) the Court in a very able opinion deciding the law unconstitutional, says: " The act in question, when it came from the hands of the Governor with his signature attached, did not necessarily express the will of a single member of either house upon the subject matter of the law. It expressed this much and no more : that

it was the will of the Legislature that the question be submitted to the people to decide whether it should become a law of the State or not.    The Governor by signing it only approved of thus submitting the question to the people.    The language of the act itself shows clearly that such was the intention of its framers."    And so with the act under consideration.    The language employed in the 18th, 19th and 20th sections shows clearly and conclusively, that the framers intended to submit the entire act to the electors, for their decision as to the expediency of adopting it as a law or not.

In Parker vs. Commonwealth, (6 *Barr.* 507,) which was a cause under an act authorizing the people to decide by ballot whether license to retail liquors should be permitted, the Supreme Court of Pennsylvania declared the act unconstitutional, and, in terms, entirely condemned this kind of legislation as unauthorized and void.

In Rice vs. Foster, (4 *Harr.* 479,) which was also a case, decided by the Supreme Court of the State of Delaware, under an act authorizing the people to determine by ballot whether licenses for the retail of liquors should be granted, after full arguments by Mr. Baird, a distinguished lawyer, for the plaintiff, and the Hon. John M. Clayton for the defendant, and in which the act is declared to be unconstitutional and void, is one of the most able opinions, in my view, to be found in the books.    In the opinion, the Court lays down the doctrine, in broad, clear and comprehensive language, " that the people having transferred the power of enacting laws to the Legislature, they cannot resume or exercise it, or any portion of it.    That they have the power to change or alter the Constitution in the mode prescribed by the instrument itself, and no other, and that to attempt to do so in any other mode is revolutionary.    That the powers of government are trusts of the highest importance, on the faithful and proper exercise of which depend the welfare and happiness of society.    That these trusts must be exercised in strict conformity with the

48

spirit and intention of the Constitution by those with whom they are deposited ; and in no case whatever can they be transferred or delegated to any other body or persons, not even to the whole people of the State. That the act authorizing the people to determine whether licenses should be granted, in no legal sense was a law; that it was not complete and positive in itself when it came from the Legislature. And that it was not a rule prescribed by that body to the citizens, enforcing some duty, or prohibiting some act, but only to become a rule when enacted or sanctioned by the popular vote."

These cases are clearly in point, and they must be conclusive on this branch of the case under review; and as appears to me, the reasoning of the Court in either of the cases referred to, is sufficiently potent to dispel any doubt remaining in the mind of any man, who has even a superficial knowledge of a representative system of government.

It was in argument in this cause, further contended and insisted by the learned counsel for the people, that the Legislature has the power to pass acts to take effect upon the happening of some future contingent event, and that the act in question is such a contingent act. And in support of this proposition, a number of acts were referred to, such as acts of private or municipal incorporations, acts for the creation or division of towns and counties, an act of Congress for the admission of Michigan into the Union, and an act of Congress for the retrocession of Alexandria to the District of Columbia. These are all special acts—acts local in their character—not one of them is a general penal law of a State or of the United States. Acts of private incorporation are acts of contract; they have ever been regarded and legally held as contracts between the State and the corporators. Necessarily there are two parties, and necessarily the corporators must meet and organize under the provisions of their act of incorporation, by the election of officers and paying

in the stock, if any is required, in order to avail themselves of the benefit and franchises of the grant. These acts of organization constitute an acceptance of the grant on the part of the corporators, but they are not legislative acts. It was not by the legislature left to the people to determine by ballot at an election to say whether the act of incorporation should become a law, and if so, when. The act is perfect, and fully passed by the Legislature, and being in the nature of a contract, of course it must be left to the corporators to determine whether they will accept of the grant or not. There is nothing strange or mysterious in this, any more than in any other contract, whether between individuals or otherwise. An acceptance of a proposed contract is necessary to render it valid and obligatory. And so in municipal corporations, whether for the organization of a town or county, it is necessary as an acceptance of the privileges of the grant, that the inhabitants organize pursuant to the provisions of the act of incorporation, by the election of the proper officers, &c.

But whoever before heard of these acts of organization being legislative acts? They are not in their nature legislative, but either executive or administrative acts, and so they have ever been legally considered and held. In respect to the acts of Congress referred to, they are both acts in the nature of compacts, and such as Congress, under express provisions of the Federal Constitution, had the undoubted power to enact. Being in the nature of compacts, some action of the people subsequent to their passage became necessary to their acceptance and consummation; but such subsequent action was not legislative in any point of view, or by any known rule of law. And to me it has been a matter of astonishment, that the acts referred to should be claimed or considered in the least possible degree analogous to the act before us. They are not analogous, nor can they be legally so considered by any analogy of principle, or by any

known rule of legal construction. The highly penal act before us, designed as a general law of the State, is not, I apprehend, a mere matter of compact between the Legislature and the electors of the State, under the Constitution. In Rice *vs.* Foster, the case already referred to, it is said by the Court, " that an act may be limited to expire at a certain period, or not to go into operation until a future time, or the happening of a contingency, or some future event, or until some condition be performed; and of this description of laws are those respecting duties and imposts; laws respecting private corporations, which are not to operate until some condition be performed, or the assent of the corporators be given. All such laws are complete and positive in themselves when they pass from the Legislature, and are not to become laws by the creative power of other persons." In Bradley *vs.* Baxter, also before referred to, it is said by the Court on this question, " most laws are intended to be prospective in their operation, and they may provide in themselves to take effect only on the happening of some uncertain contingent event. Several cases of that kind of legislation were cited. Some were cases of laws enacted to take effect upon the performance or non-performance of some act of a foreign government; some by a municipal corporation, and in some cases of an individual. But in none of these cases," says the Court, " was the act of the Legislature made to take effect upon any *decision* of such foreign or extraneous power upon the *expediency* of the act itself. These laws were to take effect upon the happening of events which, in the opinion of the Legislature, rendered such a law *expedient and proper* for such a state of things. The circumstances, to meet which such laws were enacted, were contingent and uncertain, but the laws themselves expressed fully the deliberate will of the *law-making power*, provided the circumstances should happen, to which the laws themselves were to apply ?

" But," says the Court, " the subject matter upon which

the law in question was to operate, was neither contingent nor uncertain. The necessity of the law was just as imperious before the decision of the people at the ballot-box had been ascertained, as it was afterwards. The evils which the law was designed to remedy, were neither augmented nor diminished by that decision. Everything, so far as the subject matter of the law was concerned, remained *in statu quo.* What then was the condition upon which the law was to take effect? What was the uncertain contingent event, upon the happening of which, it was to become a valid and binding law? It was simply no more nor less than the decision of the people at the ballot-box, upon the *expediency* of the law itself. It was submitting to them the question of *expediency* on the adoption or rejection of the proposed law. It was creating a new legislative power to exercise one of the most important functions in legislation."

Independent of any investigation or reflection of my own on this question, these eminent views of the Court, to my mind, would have been entirely satisfactory and conclusive. The reasoning of the Court in the case, cannot be successfully assailed or controverted. It is a self-evident proposition, that the event on which an act may be made to take effect, must be such, in the judgment of the Legislature, alone, as to affect the expediency of it; an event on which the expediency of the act depends, and which, in case it happens, will, in the judgment of the *law-makers*, render the law necessary. And the Legislature cannot legally appeal to any other man, or body of men, to decide this question of expediency for them; but the members of that body must exercise their own judgments definitely and finally upon it, in discharge of the high and responsible duties imposed upon them by the Constitution. This they are required to do, and they cannot legally evade it, in any case, without an infraction of the Constitution, and a palpable violation of their official duty as representatives of the people.

The judicial decisions cited for the purpose of sustaining this kind of legislation, and the validity of the act in question, entirely fail to do so. They are generally decisions in relation to acts, such as those referred to; and are, in my judgment, entirely inapplicable. The strongest case adduced was the case of Johnson vs. Rich et al., (9 *Barb. S. C.* 680.) In that case, the decision, as well as the reasoning of the Court to sustain it, are based entirely upon false premises, and the decision was subsequently overruled by the Court of Appeals.

The act in question was passed by the Legislature under our present Constitution; we should therefore look to that instrument, and to fundamental principles, in connection with the act, for the purpose of deciding the question presented, instead of looking exclusively to decisions by Courts in other States, upon special and local legislative acts of those States. Our present Constitution (Art. 4, Sec. 38) expressly authorizes the Legislature to confer by law upon the organized townships, incorporated cities and villages, and upon the Boards of Supervisors of the several counties, such powers of a local legislative and administrative character, as may be deemed proper. By art. 10, sec. 2, the Legislature is expressly authorized to pass laws for the organization or alteration of counties, and for a vote of the electors of such counties thereon. Section 8, of the same article, authorizes the Legislature to pass acts for the removal of county seats, and for a vote of the electors in such counties thereon. And by sec. 11 of the same article, the Legislature is authorized to empower by act, the Board of Supervisors, in the several counties of the State, to lay out highways, construct bridges, and organize new townships, &c. In view of these express constitutional provisions, it is clear that the acts and decisions referred to, can have not the least applicability to the cases under consideration.

It was also contended, that if the provisions of the act

authorizing its submission to the electors, were found to be repugnant to the Constitution, they might be expunged, and the remaining provisions left in force.

There is no doubt, that where an independent section of an act of the Legislature is unconstitutional, and not so connected as to affect the other provisions of the act, it may be declared void, and the remaining sections left in force. But the act under consideration does not happen to be such an act; the sections which counsel claim the Court may strike out, if found unconstitutional, are so connected with the other provisions, as to affect and taint the whole act. It is the legislative action of the electors, pursuant to the provisions contained in these particular sections, that gives the entire act vitality, legal existence as a law of the State, if such existence it has at all. We cannot first expunge those sections, and then examine the balance of the act to ascertain whether it contains any provision in conflict with the fundamental law. The Court cannot legally close its eyes without looking at the act, and strike out as unconstitutional, such sections as may be designated by counsel, and then open them, and examine the remaining sections. It is a well settled and sound rule of law, to be observed by Courts in construing the provisions of the statutes, that every word and every clause of a statute shall be presumed to have been intended by the Legislature to have some meaning and effect; and for the purpose of ascertaining the true intent and meaning of the Legislature, it is the duty of Courts, first to look at all the provisions of the entire act, as it came from the Legislature.

In the application of this legal principle to the act before us, what appears? It clearly appears, as before conclusively shown, that the Legislature never exercised its legislative judgment upon the *expediency* of such a law, but referred that question to the electors of the State for their determination. That the Legislature never passed the act, or intended to pass

it, as a valid, subsistent law of the State *in præsenti*, to take effect *in futuro* or otherwise, but in violation of the Constitution assumed to invest the electors of the State with legislative powers, and authorize them *collectively* to say by ballot whether the act should be adopted, established, and put in force as a law of the State or not. These sections do, therefore, materially affect the entire act, and cannot be expunged and the balance of the act left to stand in force as law. The position is not sustainable, there is no legal force in it, as the principle contended for is not applicable to the act in question ; and I therefore deem it entirely unnecessary to occupy further time upon this point in the case.

There are other grounds besides that already considered, which render the act most palpably repugnant to the Constitution, and which I cannot consent to pass over without noticing, although some of them were not mooted in the argument of the cause.

The Constitution (*art.* 4, § 20) is express and positive that " no law shall embrace more than one object, which shall be expressed in its title." This is not only a clear, but a very salutary provision, and if sustained and enforced as it should be, our statute laws enacted by the Legislature hereafter, will be different from some which the people have been heretofore cursed with since the organization of our State government. This express and positive provision was incorporated into the Constitution with the avowed *intention* on the part of the framers, of arresting, as far as possible, corruption and log rolling in legislation—you help me and I will help you—I will support your bill and help you pass it, if you will permit me to insert a section on a certain matter, &c. ; a system of legislation that has often been carried so far as to become disgraceful to representatives and deeply injurious to the public ? And how is it with the act before us ? Does it not embrace more than one distinct object, and if so, are those objects clearly expressed in the title ? The title

of the act is in these words : " An act prohibiting the manufacture of intoxicating beverages and the traffic therein." The act, therefore, expressly, and in terms, embraces by its title two distinct objects. The manufacture of an article is one thing, and the traffic therein is another and a distinct thing. " *To manufacture* is to make; the operation of making, whatever is used by man ; any thing made from raw materials by hand, by machinery or by art." So says Dr. Webster. " *To traffic* is to trade, either by barter or by buying or selling; to trade—to pass goods and commodities from one person to another, for an equivalent in goods or money, &c." So says Dr. Webster.

There are then two distinct objects embraced in the body of the act, which are clearly expressed in the title, and there is no possible escape from this position. The first section of the act says : " No person shall be allowed to *manufacture or sell*, &c.," making in terms a clear distinction between manufacturing and selling. This distinction is kept up by the Legislature throughout the body of the act, by the imposition of one penalty for selling, and another, and a distinct penalty, for manufacturing. The *fourth* section provides that " if any person shall, at any time *sell*, &c., he shall forfeit and pay on the first conviction, ten dollars and the costs, and stand committed, &c. ; on the second conviction twenty dollars, &c.; on the third, and every subsequent conviction, twenty dollars, and be imprisoned not less than three months, &c." By the *eighth* section, the act provides that " no person shall presume to be a *manufacturer*, on pain of forfeiting on the first conviction, one hundred dollars and costs, and be imprisoned, &c.; and on the second conviction two hundred dollars, &c., and be imprisoned, &c.; and on the third, and every subsequent conviction, two hundred dollars, &c., and be imprisoned, &c." These separate and distinct penalties, one for manufacturing and the other for selling, furnish the most indubitable evidence that the Legislature so under-

49

stood it, and framed the act accordingly. It would be preposterous in the extreme, to say that selling is necessarily an incident of manufacturing ; for if it is, then manufacturing and selling can only constitute one offence, and two distinct penalties could not be legally or justly imposed. But it is sufficient to say that the Legislature has embraced manufacturing and selling in the same act, as two separate and distinct objects, as they are in fact. This, however, is not the worst feature of the act in this respect. There are other distinct objects embraced in the body of the act, which are not at all expressed in the title. And as to this, no one who has read the act can entertain any doubt, or be under the least misapprehension as to the fact. The title is, " An act prohibiting the manufacture of intoxicating beverages, and the traffic therein," and strange as it may appear to the world generally, in every township, village and city that has been organized a body corporate and politic for *municipal purposes*, under the Constitution and laws of this State, have, without exception, been created by express provisions contained in the act, *liquor dealers* with full power and authority to buy and sell liquor, to make profits thereon, and to raise money by taxing the inhabitants, to invest directly in the traffic. This, most assuredly, is a clear specific object, which is beyond all doubt distinctly embraced in the body of the act, but which is not expressed in the title. On the contrary, the object is at war with the very words of the title, that in positive terms says the act prohibits the sale, and yet the sale is expressly authorized by the act, throughout the State.

Again, the submission of the act to the electors, at a special election to be called for the particular purpose of enabling them to determine by ballot whether the act should become a law or not, is another special object embraced in the act, which is entirely distinct from all the other objects contained in it, and which is not expressed in the title. Will it be contended by any man whose mind has ever been enlightened

· by a single ray of intelligence, that this specific and distinct object is an incident of any of the other objects embraced in the act? The expression of such an idea would render a man ridiculous. Was not the submission of the act to the elec-. tors for their decision upon it, an ultimate purpose of the Legislature—a purpose which that body expressly designed to attain and accomplish by it? If it was, then beyond all question it was one of the distinct and primary objects of the Legislature, and which was incorporated into the act, in violation of the express provisions of the Constitution. How do we know but that the act was finally carried through the Legislature by *log rolling* this or some of the other distinct objects into it, which are not expressed in the title? Does it not sufficiently appear by a reference to the legislative journal, saying nothing about the traditional history of the matter, that the act was so carried in fact? And was not such a system of legislation the very evil which the constitutional provision was designed to arrest and prevent in future? It was, and it is one among the most important and valuable provisions incorporated into the fundamental law, and should be sustained and enforced to the letter.

The constitution of the State of Georgia contains a clause, that no bill shall pass containing any matter different from that expressed in its title. Under that provision, the Supreme Court of the State, in Mayor, &c., of Savannah *vs.* State, &c., (4 *Geo. R.* 26,) decided that any matter contained in an act, and not expressed in the title, is void. This was a sound decision under the Constitution of that State, and is directly in point.

The several distinct objects embraced in the act before us, no one of which is, by any rational construction, an incident of any other, must necessarily and inevitably render the entire act unconstitutional and void.

But again: the Constitution, art. 4, sec. 47, contains the express provision "that the Legislature shall not pass any

act authorizing the grant of license for the sale of ardent spirits or other intoxicating liquors." There is no ambiguity in this provision; it is explicit, broad and comprehensive. But, notwithstanding this clear and positive inhibition, the act under consideration expressly authorizes the grant of license for the sale of liquor. Does it not, in terms, author- ize a grant of such a license? What is a license? "A permit by grant of authority; leave; permission." Section 5 of the act expressly authorizes the Township Board, or Common Council of every city or village in the State, to appoint and authorize some person of such township, city or village, to sell spirits, wines and other intoxicating liquors." Is not this a permission by grant of authority to sell? I appre- hend it is, and that, too, in open violation of this express constitutional inhibition. But it is said that the meaning of this provision is, that the Legislature shall pass no act author- izing a grant of license to individuals to sell. Such was not the intent of the framers of the Constitution, as evidenced by the journal of their proceedings on this question; nor will the provision bear such a construction, without an absolute perversion of the language employed. The words are: "the Legislature shall not pass any act authorizing the sale, &c.;" not that no act shall be passed, authorizing a grant of license to individuals to sell. But the act does, in terms, authorize a grant of license to individuals; not to them generally, it is true; but to one in every township, city or village in the State. These individuals being called agents, can make no difference; they are, under the act, licensed by the town- ships, cities and villages, to sell. But bodies corporate and politic, incorporated for municipal purposes, can no more be authorized by the Legislature to sell, than individuals; for the one is no more excluded from this right, by the language of the Constitution, than the other. And if the force and effect of the sweeping language used in this prohibition can be done away with by construction, then the entire Constitu-

tion may in the same way be rendered a dead letter; for the instrument contains no provision more plain or positive. But I entertain not a shadow of doubt myself, on the point; this provision of the act is in direct conflict with the Consti-. tution.

I might stop here; but there are other provisions contained in the act, that, in my judgment, are more obnoxious, if possible, to the spirit, if not to the letter, of the Constitution,. than any which have been already considered; and I cannot consent to close without referring to them.

The *tenth* section of the act, after making provision for complaint, the issuing of a warrant of search, the seizure of the liquor, &c., contains a further provision that " unless the owner can show by *positive proof*, that the liquors seized are of foreign production, that they have been imported under the law of the United States, and in accordance therewith ; that they are contained in the original packages in which they were imported, and in quantities not less than the laws of the U. S. prescribe, or were at the time when seized held by him for lawful purposes, the liquor is to be forfeited and publicly destroyed."

A more disgraceful, unjust provision than this, was never incorporated into a statute book. It outrages humanity, abrogates in this class of cases fundamental principles of the law of evidence, and in effect entirely prohibits the owner of. the property from making any defence whatever in the case. A man found in possession of stolen goods, is presumed, *prima facia*, to be the thief. But this legal presumption he may rebut, and thus exculpate himself by showing that he came honestly by the property; but this showing he is not required, by law, to make by *positive proof* of the fact ; on the contrary he may do so by any pertinent facts and circumstances that are sufficient to satisfy the Court or jury. But under the provision of the act in question, the accused is imperatively required to prove, by *positive proof*, that

which is impossible from the very nature and circumstances of the case. An importer of spirits and wines in the city of New York, or any other Atlantic city, could not make the required proof by *positive evidence ;* nor could he do anything more in forty-nine cases out of fifty than to make out a *prima facia defence* in such a case, by facts and circumstances. If he should bring the man of whom he purchases the liquors in England or France as a witness, what could he prove? He might be able to identify the original package, but could he or any other person *swear positively* that the liquor was the same, that it had not been changed on the ocean or elsewhere? Could the master of the vessel in which it was imported *swear positively* to the fact? No such positive proof could be made; much less would a vender in Michigan who buys his stock in New York, be able to make proof positive of all the facts required by this extraordinary and oppressive act.

But how could the accused in such a case show by *positive proof* that at the time of the seizure, he held the liquor for a lawful purpose? who could *swear positively* to the real intent of his mind on the subject? And his own declarations as to his intent, would not be admissible as evidence for himself. Under the penal provisions of the act could he have held the liquor lawfully for any purpose? He is not the authorized agent for selling ; nor is it to be presumed that the Legislature intended that this severe provision should have any application to that class of public functionaries. The liquor by the act is absolutely condemned; it has already, under such condemnation, been seized, and is ready for public destruction, and the owner before the Court, and about to be fined and imprisoned for having it in his possession. The possession being declared, by the act, unlawful, how could he show by *positive proof* that he held it lawfully ? He could not; it would be impossible. And yet, such is the proof he is required to make. If absurdity and injustice alone were in-

volved in this section of the act, I should not here, in the consideration of the constitutional question presented, have even noticed it.  But by this section of the act, the Legislature has assumed to exercise the power of taking away and entirely abrogating private rights—rights that have become legally vested—by the seizure and wanton destruction of private property, honestly and lawfully acquired under the Constitution and laws of the State.  This is the exercise of a power that the Legislature does not possess—a power which has never been conferred upon that body or any other department of the government, and one which I, as one of the individual members of the State, will never consent to surrender to any man or body of men ; and much less am I disposed to submit to the exercise of this power on the part of the Legislature without right, and by a mere high handed assumption.  The attempt on the part of the Legislature to exercise this power, is the assumption of despotism.  That the Legislature by act, and as a police regulation, can and may regulate the sale of intoxicating liquors by restriction as to the quantity sold, or by an absolute prohibition of the traffic therein by the drink, I have never doubted; nor have I ever doubted the propriety or necessity of such police regulations in every civilized community.

Property lawfully acquired, under the Constitution and laws of the State, by a citizen to-day, becomes vested, and his right to it is a vested private right; and the Legislature cannot step in to-morrow by an act, and take away that right and authorize an absolute destruction of the property.  Such an act would be a *retrospective law*, and have a *retroactive* effect, and would be in direct conflict with sec. 10, art. 1, of the Constitution of the United States, and sec. 43, art. 4, of the Constitution of this State.  "Restrospective laws," says an able commentator, "are not confined to such as are created to take effect at a time anterior to their passage; but the term embraces all statutes which, though operating only from their

passage, affect *vested rights* and past transactions. Upon this principle, every statute which, as to the citizen takes away or impairs vested rights acquired under existing laws, or creates a new obligation, or imposes a new duty, or attaches a new disability in respect to transactions or considerations already past, is *retrospective*." Such has ever been the construction put upon the legislative power and acts of Parliament. The English Courts, as early as 1667, decided that a statute could not operate *retrospectively*. A law is a rule of civil conduct, and as such prescribed for, and attaching itself to the future actions of men. It must, from its very nature, be prospective, otherwise it cannot be a rule of civil conduct. It cannot attach itself to conduct antecedent to the rule itself. Chancellor Kent correctly says, "that the very essence of a new law is a rule for future cases." The doctrine on that subject in this country is well established and distinctly understood. It is, that acts of the Legislature which look back upon interests already settled, or events which have already happened, are *retrospective*, and prohibited, because they are highly injurious, oppressive and unjust. In Wilkinson *vs.* Leland, (2 *Pet.* 646,) Mr. Webster, as counsel for the defendant, justly said: "It is of no importance to the question before the Court, whether there are any restrictions or limitations to the power of the Legislature imposed by the Constitution, for if at this period there is not a general restraint on legislative power, there is an end to private property." In the opinion of the Court, and which fully recognizes the doctrine of Mr. Webster, it is said: "That government could scarcely be deemed free, where the rights of property were left solely dependent upon the will of the Legislature, without any restraint. The fundamental maxim of free government requires that the rights of private property should be held sacred, and that no Court in this country could be warranted in assuming that the power of violating and disregarding them—a power so repugnant to the principles of justice and civil liberty—lurked

under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people." Numerous decisions analogous in principle might be referred to, but it must be entirely unnecessary, as the principle is a broad fundamental principle, which lies at the very foundation of our political and social compact, and has been universally recognized as such since the foundation of a republican form of government in this country. With this view, I have no doubt that the tenth section of the act in question is a gross and glaring infraction of the Constitution. Upon the same ground, and upon the same broad fundamental principle, I have no doubt that the first section of the act prohibiting the manufacture of spirituous liquors, is equally obnoxious to the spirit of the Constitution, and to the principles upon which the Government was founded.

The manufacture, merely, of spirituous liquors, is in and of itself, harmless. No injury to the public can be justly said to arise from it. The mere manufacture thereof, cannot, upon any sound principle, be adjudged a nuisance, and prohibited on that ground. Its evil, then, must consist wholly in the abuse of it by individuals, after it has been manufactured, and not in the manufacture itself. The manufacture is one thing, and the abuse of it by individuals is another and distinct thing. The abuse of it by individuals, when carried so far as to affect the welfare of the public, is, I have no doubt, a proper and legitimate subject of legislation. But so long as the article is indispensably necessary, for a great variety of important and legitimate purposes, I deny that the Legislature has the power to inhibit the manufacture of it. That the article is necessary and indispensable in a great variety of medicinal, mechanical and manufacturing purposes carried on in our country, no sane man will dispute. The Legislature, by the act in question, fully admits it, and has assumed to make the necessary provisions accordingly.

If the Legislature by implication, can inhibit the manufac-

ture of spirituous liquors, because they have been abused in their use, then, upon the same principle, by an assumption of power, it may inhibit the manufacture of steam engines, for they, by the abuse of them, in the hands of reckless individuals, have destroyed the lives of thousands in this country, and some of the best and most valuable of our citizens. But who believes that the Legislature has the power to inhibit their manufacture? There is no rational being in the State who believes it. Why not? The cases are parallel, and the principle involved analogous, and if the Legislature has the power in the one case, it clearly has in the other. There can be no doubt that in consequence of indolence and want of physical exercise, the imprudent and reckless manner of dressing, and especially the feet, thousands of the American youth, and particularly females, have gone and are constantly going to premature graves. Neither can there be any doubt that these improvident and reckless habits are tending to reduce the American race in stature, strength, mind, and health; and that, unless this lamentable course can be arrested, these pernicious habits must in time become a national calamity. Yet, who can help it? What can be done on the subject? Has the Legislature the implied power under the Constitution to prescribe exercise and dress, or to inhibit the youth of the country from dressing as they please? Clearly not. Still, the Legislature has as much power on this subject, as it has to inhibit the mere *manufacture* of spirits. But the Legislature can do neither. And any attempt to do so, would be an unauthorized assumption of power, and subversive of the social compact.

In Taylor *vs.* Porter, (4 *Hill*, 164,) Bronson, J., says : "What is legislative power, and how far does it extend? The security of life, liberty and property lies at the foundation of the social compact, and to say that this grant of legislative power includes the right to attack private property, is

equivalent to saying the people have delegated to their ser--
vants the power of defeating one of the great ends for which
governments are established."

In University of Maryland *vs.* Williams, Chief Justice
Buchanan says: "Independent of any restrictions in the
Constitution of the State, there is a fundamental principle of
right and justice, inherent in the nature and spirit of the so--
cial compact of this country, in the character and genius of
our system of government, the causes from which they sprung,
and the purpose for which they were established, that rises
above and restrains and sets bounds to the powers of legisla--
tion, which the Legislature cannot pass without exceeding its
rightful authority. It is the principle which protects the
life, liberty and property of the citizen from violation in the
unjust exercise of legislative power." In Fletcher *vs.* Peck,
(6 *Cranch*, 87,) Chief Justice Marshall said: "The principle
asserted is, that one legislature cannot abridge the power of
a succeeding legislature. But if an act be done under a
law, a succeeding legislature cannot undo it. The past can--
not be recalled by absolute power. And it may well be
doubted whether the nature of society and government does
not prescribe limits to legislative power, and if any be pre-
scribed, where are they to be found, if the property of an
individual citizen fairly and honestly acquired is not to be
protected, but may be seized without compensation ?"

In the case of Calder *vs.* Bull, (3 *Dall.* 386,) Justice Chase,
in a very able opinion, said "that he could not subscribe to
the omnipotence of a State Legislature, or that it was ab-
solute or without control, although its authority was not ex--
pressly restrained by the Constitution. That governments
are erected to establish justice, to promote the general wel--
fare, to secure the blessings of liberty, and to protect their
persons and property from violation. And the purpose for
which men enter into society, determines the nature and
terms of the social compact, that no man shall be compelled.

·to do what the law does not require, nor to refrain from acts which the law permits.    These are vital principles, lying at the foundation of a republican government, such as the right to private ·property honestly acquired, for the protection of which government was established, that the Legislature cannot abrogate or over-ride."

Again, I insist that the manufacture of any article, useful in the country, or an article of trade and commerce, is the natural right of every citizen; a right that has never been surrendered by the citizens to the Legislature or any other ·department of government, and a right that falls as much ·within the protection of government as any other.   If those citizens who have heretofore invested their property in manufacturing establishments, for the manufacture of either spirits or beer, and I care not which, when by law they were authorized to do so, and the Legislature can step in, by an ·act like the one before us and prohibit them from manufacturing, and thus put a stop to their business and sink the ··entire value of their investment, what becomes of vested private rights?   Where is to be found their protection by the government, which the people have adopted for that express purpose?   Mr. Smith, in his very able Commentaries on Constitutional Law, says: "It would be assuming too much to suppose that the people intended to delegate any power to be exercised, *irrespective* of the original purpose of the social ·compact, or in any way which would be subversive to its object and design.   The reasonable presumption would be ·that the authority delegated must, from necessity, arising from the nature of the design, be limited in its exercise to ·such acts, and such only, as are calculated to effectuate the original design and purpose of the people, when the government was founded.   Wherever the Legislature transcends the bounds of its original authority, or so far disregards the sacred trust committed to it, as to pass an act *subversive of natural rights*, ought not such an act to be regarded as ex-

ceeding the power delegated? And if so, must not the want of power in the Legislature render such an act invalid, and wholly divest it of the attributes of an imperative legislative authority?"

Judge Patterson, in the decision of a case involving the constitutionality of the act of the Legislature of the State of Pennsylvania, says: "Men have a sense of property; property is necessary to their subsistence, and correspondent to their natural wants and desires; its security was one of the primary objects that induced them to unite in society. No man would become a member of community in which he could not enjoy the fruits of his honest labor and industry. The preservation of property is one of the great objects of the social compact, and is a fundamental law. Every person ought to contribute his proportion for public purposes, but no one can be called upon to surrender or sacrifice his whole property for the supposed good of the community." The English history does not furnish an instance of the kind; the Parliament, with all its boasted omnipotence, never committed such an outrage on private property. Such an act would be a monster in legislation. In England, a limited monarchy, where there is no written constitution, and where Parliament in its omnipotence can mould it at its pleasure, a more sacred regard has ever been paid to private property and its protection by government, than in America, surrounded as we are with a blaze of political illumination, where the legislatures are limited, where we have republican governments by which the protection and enjoyment of private property are said to be rendered inviolate. I am aware that it is often proclaimed by men who advocate the enforcement of the act in question, that it is right and justifiable to sacrifice the few for the good of the many. But I have never yet seen the man who advocated this damnable doctrine, which is alike destructive of civil government and personal rights, that was willing and ready himself to be made

the sacrifice; to have his property, lawfully and honestly acquired, destroyed, and himself and family beggared for the supposed good of the many. They are not, therefore, honest in their philanthropic professions. The doctrine itself is the mere thunder of canting hypocrites and political demagogues; the most detestable of all beings that ever infested a civil government. The world has never, at any stage of it, been reformed by oppressive penal laws, which are destructive of liberty and the right of property. And a legislative body might as well undertake, by a despotic penal enactment, to chain down the winds of heaven to prevent their blowing, as to compel the American people, by such enactments, to be sober, moral, or religious.

There is no view which I have been able to take of the act under consideration, without coming inevitably to the conclusion that it is, in its passage and provisions, most flagrantly repugnant to the Constitution, and the cardinal principles upon which our republican system of government was established.

Neither the Legislature, or the judiciary, have the power to alter or bend the Constitution, to meet particular cases. They are bound by the letter of it, when plain and explicit, and it should be the pride and pleasure of both departments of the government, to defend and sustain it to the letter, and to the last.

As to the policy and expediency of a statute, Courts have nothing to do ; but I may, I apprehend, be permitted to say, that I have never been able to see any reason for all the useless machinery and impracticable provisions incorporated by the Legislature into the act in question, when a constitutional law, with a single section, could have been framed and passed, and as readily enforced as any other law, that would have put an end to the real evil complained of. And before closing, I feel it my duty to say, that I deeply regret the evils sought to be removed by the act before us ; but, great

as these evils are, and as much to be deplored and deprecated as they may be, I had much rather be compelled to witness their continuance in the land, for years yet to come, than to see our constituted system of representative government perverted, and a collective democracy established, by an assumption of arbitrary, unconstitutional power, on the part of the Legislature, and a ratification of such assumption by the people. And it is a matter to me of deep regret, to see citizens of age, intellect and influence, and among them *moral* and *religious teachers*, so far forget their duty as such citizens, and so far lose sight of the great value of our constituted system of government and the fundamental principles of the Christian religion, as to enter into the political contest, touching the adoption of the act in question, openly proclaiming that they did not care whether the act was constitutional or not; they were determined to support and enforce it; if it was unconstitutional, the Judges would not dare to declare it so; if the act could be carried at the ballot box by ten thousand majority. Such a doctrine is of evil tendency, and treasonable in principle. It is the open inculcation of a total disregard of established government and fundamental laws, and if persisted in, must have a most pernicious influence, especially upon the rising generation. Such conduct is in the highest degree reprehensible, and should ever be reprobated and condemned, and the perpetrators spurned as traitors to their government, and enemies to the best interests of their fellow men.

MARTIN, J.

The only question in this case which I propose to consider is, whether the reference of the law under consideration, to the people, in the manner and for the purpose contemplated by it, renders it unconstitutional.

It is contended, upon behalf of these defendants, that such

.is its effect, because : 1st, it is a delegation of legislative power by the legislative department to the people; and 2d, that if it be not a direct delegation of power, it is such virtually, by the creation of a contingency, upon the happening of· which the law goes into effect, which is unauthorized by the Constitution, and the operation of which is to invest the people with legislative power equally, as though the law were .directly referred to them for enactment.

That the Legislature has no right to delegate its power to enact general laws which shall affect the property, and be binding upon. the social and political right of citizens, I·concede. But that it has not the right to delegate any of its powers, or that such right of delegation does not fully. subsist, subject only to this. restriction, all past history denies. From the earliest periods of legislation down to the present day, this power has been exercised in innumerable instances, and for every variety of purpose. Without stopping to instance particular cases, it is sufficient to point to the delegation of pure legislative power to municipal corporations. These, the mere creatures of law, and dependent upon it for existence and for every power and right, have always been invested by legislative sanction, with power to enact and enforce laws controlling the persons and property of citizens, creating offices and imposing penalties, and have ever been invested with the highest attribute of sovereignty, the power to exercise the right of pre-eminent domain within their ter-· ritorial limits.

The much abused maxim, then, that delegated power cannot be delegated—which has been forced and distorted into every conceivable shape, in order to reconcile it with instances of its apparent infraction, and to assist Courts to overrule legislative action—has limitations to its application. "The extent to which this maxim should be applied to a Legislature," says Caton, J., in, the well considered and ably reasoned opinion in the case of the People *vs.* Reynolds,

(5 *Gill.* 1,) "depends upon a proper understanding of legislative powers"—upon a proper determination of what may legitimately be done in the exercise of these powers. It is easy to say, it is the business of a Legislature to make laws, but then we must inquire, what kind of laws may be made? Must they be full—complete—perfect—absolute—depending upon no contingency, and conferring no discretion? This would be absolute legislation, exhausting legislative power on the subject matter of the law. We presume that nowhere has constitutional learning advanced so far as to assert this doctrine. For instance, in determining what is proper legislation, we feel warranted in looking at the past, to see what kind of laws legislative bodies have been in the habit of passing. If we take the action of past legislatures, as determining what may and should properly be done in the exercise of legislative power, we shall see that while they are bound to make the laws, yet those laws may not be absolute, nor make every provision for doing that which they may authorize to be done. While all must be done under their *sanction*, yet they need not do all, nor command all. If the saying be true, that the Legislature cannot delegate its powers, it is only so in its most general sense. We may well admit that the Legislature cannot delegate its general legislative authority ; still, it may authorize many things to be done by others, which it might properly do itself.

Without stopping to establish a proposition which all past history affirms, I will assume, then, that the restriction upon the right of the legislative department to delegate its power, is confined to the power to pass general laws; whilst it may confer, in many instances, local, special and administrative legislative power upon corporations or communities ; and may refer local and special laws to such bodies, or to individuals. It is somewhat singular that the first cases in which this question arose, and in which the right of legislatures to delegate their power was broadly and unequivocally denied,

were cases involving the validity of license laws ; and that in these cases, the distinction between general and local, special and administrative laws, was entirely overlooked, or unperceived, and an attempt made by arguments wholly inconsistent and untenable, to explain away the innumerable instances of proper and necessary delegation of such power, which can all be reconciled by the rule I have above stated. These cases are, Rice *vs.* Foster, decided in the Supreme Court of Delaware, in June, 1847, (4 *Harr.* 479,) and Parker *vs.* the Commonwealth, decided in the Supreme Court of Pennsylvania, in September following, (6 *Barr.* 507.) No one can examine these cases without being struck with this fact. Whether the ultimate conclusions to which these Courts arrived, were correct or not, I hold to be immaterial ; certainly the contrary was held in the case of Bancroft *vs.* Dumas, (21 *Verm.* 456,) and their authority denied in the People *vs.* Reynolds, *ubi supra*, and in Johnson *vs.* Rich, (9 *Barb. S. C.* 685,) and, except so far as they maintain the proposition that the Legislature has no right to delegate its power to enact general laws, which shall affect the property, and be binding upon the social and political rights of all citizens, virtually overruled in the cases of the Com. *vs.* Judges (8 *Barr.* 391;) same *vs.* Pointer, (10 *Id.* 214;) in the opinion of Judge Hitchcock, (20 *Ohio, app.* 1;) and in C., W. & Z. R. R. Co. *vs.* Clinton Co., (1 *Ohio N. S.* 77.) The dissimilarity of the laws under discussion in those cases and the one before us, is so great, that no one can claim for them any direct authority as applicable here, beyond the general proposition above conceded.

It is also worthy of note, that in these cases it became necessary, in order to sustain the arguments advanced, and to deduce the conclusions sought, to usurp a judicial power as unwarrantable as it is aggressive and dangerous. In both it is assumed that upon the question of legislative acts, Courts may pass by the letter of the Constitution and determine the

validity of laws by their ideas of the spirit of that instru-ment and the genius of republican institutions, and we are refreshed and delighted on the one hand with glowing des-criptions of the perfections and virtues of a representative government, and horrified by a graphic description of the evils and dangers of a pure democracy on the other. In both, the political tendencies of the legislation before them were considered. In both it is claimed that the action of a Legislature may be invalid, although it contravenes no ex-press provision of the Constitution, if it be in violation of the spirit of that instrument and of the genius of the public institutions designed to be created by it, and that courts may declare laws to be invalid which are the results of such leg-islative action.

History tells us that the power of the judiciary to deter-mine upon the constitutionality of legislative action was for a long time questioned, and its existence denied by many of our most eminent statesmen ; and scarce half a century has elapsed since articles of impeachment were preferred in a neighboring State against a Judge for assuming to exercise this power. Although such right is now firmly established, it is one of great delicacy, to be exercised with great caution, and only upon absolute conviction. I can never assent to the doctrine put forth in these cases, and upon the assumption of which the correctness of their reasoning, if not of their conclusions, in a great degree depends. It is or may become the foundation of an unlimited assumption of power by the courts, totally subversive of legislative power. Under it, they may mould laws to suit their ideas of adaptation and consis-tency with the spirit and genius of republican institutions, until the Constitution itself shall be smothered beneath the arbitrary rules and dogmas of courts. It is our boast that we possess for a fundamental law *a written* Constitution, clearly defining the powers and duties of the different depart-ments of government, and the immunities of the citizens.

The exposition of this Constitution is the duty of courts; the adaptation of laws to it, and to its spirit, and to the genius of our institutions, that of the Legislature.

Thus, the powers and duties of these co-ordinate departments of the government are kept distinct.

Courts have discharged their whole duty and properly exercised their powers when they have weighed the action of the Legislature with the written Constitution and ascertained whether they conflict. To extend these powers, would operate to create a fluctuating standard dependent upon the peculiar views, and in some cases it may be the political prejudices, of those who, for the time being, may occupy the bench. "Before a court," says Hitchcock, J., "can be justified in disregarding a legislative enactment on the ground that it conflicts with the Constitution; such conflict must be *evident, clear, unmistakable*; it must be in opposition *both to the letter and spirit* of the instrument. If, after full examination, any doubt exists, the enactment must be enforced." (20 *Ohio App.* 1.) Says the Court in C. W. L. R. R. Co. *vs.* Clinton Co., *ubi supra*, "it is never to be forgotten that the presumption is always in favor of the validity of the law, and it is only where manifest assumption of authority, and clear incompatibility between the Constitution and the law appears, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case." "The Legislature," says Justice Washington, (4 *Dall.* 14,) "is in the first instance to be judge of its own constitutional powers. The presumption must always be in favor of the law, if the contrary be not clearly demonstrated." Says the Court in Louisville *vs.* Hiatt, (2 *B. Mon.* 178,) if it be doubtful or questionable whether the legislative power has exceeded its limits, the judiciary cannot interfere, though it may not be satisfied that the act is constitutional." In Fletcher *vs.* Peck, (8 *Cranch.* 87,) Chief Justice Marshall says: "it is not on slight implication, and vague conjecture,

that the Legislature is pronounced to have transcended its power, and its acts to be considered void. The opposition between the Constitution and the laws should be such, that the Judge feels a clear and strong conviction of their incompatibility with each other." And the same learned Judge who pronounced the opinion in the case of Parker *vs.* the Commonwealth, unconsciously, perhaps, reflecting upon the unwarranted assumption of power in that case, says in the subsequent case of the Commonwealth *vs.* Williams, (11 *Penn. R.* 61,) "But it is suggested that the latter act is unconstitutional. What *provision* of the Constitution of Pennsylvania does it infract? None such has been pointed out, for none such exists. *Of late years it has been much the fashion to impeach the action of legislative bodies as unconstitutional, when it happens not to accord with the parties' notions of propriety and abstract right. This is frequently done in sheer oblivion of the doctrine that express prohibition or necessary implication is essential to oust the State Legislature of authority. When this prohibition is not found in the primordial law, the execution of the law cannot be deemed unconstitutional, even though it seems to trespass upon our ideas of natural justice and reason."* The law in question I concede to be a general law. If, therefore, it is found that any power necessary to its perfect enactment is to be exercised by the people, I concede, also, that the law is unconstitutional, for both the letter and the spirit of the Constitution, by necessary implication, deny this power to the people.

What is law? " It is the declared will of the Legislature. It pre-supposes the exercise of judgment and reason; and if a general law, must be complete, positive and absolute in itself, (deriving its authority from the Legislature,) and not dependent for the enactment of its provisions upon any other tribunal, body or persons." Wherein does the law in question fall short of this definition? Wherein does it fall short of perfect enactment by the Legislature? Are any of its de-

tails left to be completed by any other body or persons, or the right to alter or amend it, confided to any ? It is as much a complete law as any law which takes effect upon a contingency, or the happening of a future event. · When it operates, it operates *propria vigore ;* it remains quiescent until the events contemplated and provided by the Legislature stir it into motion; and when set in motion, it operates by force of the " energy of life," infused into it by its creator. Legislative power is a creative power. Is the power of creation in this instance confided to the people ? Is it claimed that it is, because it is said the concurrence of the legislative and popular will is made necessary, before the law is to take effect? This is not so. In the event the popular vote should be " *no*," the act was positively to take effect in March, 1870. The concurrence of will which has stirred this law into motion, was the accident, not the creative power. It was the expressed will of the Legislature which fixed the event which resulted in the concurrence, and set in motion the law at the earlier of two fixed periods, contemplated by the Legislature itself. There was not a scintilla of *law-making* power conferred upon the people by this authority to vote. It was the authority to do an act, upon the contingency of which the law was to go into effect at a particular point of time.

This was only the creation of a *contingency ;* the exercise of a power which no man can deny the Legislature to possess.

The provisions of the 18th, 19th, and 20th sections of the act, have relation only to the creation and determination of such contingency. These sections should be construed by the well established and universally ' recognized canon of construction which requires the whole to be surveyed, and its obvious intent gathered, regardless of particular words; and if as a whole, it can receive a construction consistent with its validity, Courts are bound so to construe it. The words, " adoption of the law," &c., " *yes*," and " adoption of the law," &c., " *no*," are a mere formulary, prescribed by the

Legislature, by the use of which the contingencies should be determined. And so the act says. "If it shall appear that a majority of the votes cast have thereon 'adoption,' &c., '*yes*,' this act shall become a law of this State, from and after the first day of December, 1853. But if a majority of the votes cast upon the question have thereon 'adoption,' &c., '*no*,' this act shall take effect and become a law of this State, from and after the first day of March, 1870." It was urged upon the argument, that these words, " this act shall become a law of this State," employed in the one case, and the words, " this act shall take effect and become a law of this State," in the other, clearly indicate that the Legislature did not enact the law, but submitted the question of enactment to the popular vote. Is this a fair construction of the language of the act? Is it not rather a subtle refinement, by which an obvious intent of the Legislature is sought to be obscured?

The Legislature itself could not declare when an act should become a law. When it had passed the forms of Legislation, and received the executive sanction, it was absolutely a law by force of constitutional provisions. It could not declare it not to be such, except through its repeal. All the power confided to the Legislature over it in this respect, is to determine when it shall take effect, and a reasonable construction of these three sections, refers this language only to the time *when* the act should take effect; and such construction we are bound to adopt.

It is also said that the time fixed at which the law was to take effect, in the event the people should vote "*no*," furnishes evidence that this is a mere subterfuge, and that the Legislature really intended to submit the law to the people, for their sanction and adoption, and not to create a contingency. It is a sufficient reply to this, that the Legislature had power to fix the time when the law should go into effect, as well as declare the event upon which that time should depend; and they have done it. The motives which actuate

a co-ordinate branch of the government, when in the discharge of official duty, it does not become us to impugn. That is a matter for the people to whom they are responsible. We have no concern with any thing beyond the letter and spirit of the law. But the vote by which the contingency was determined, was not the exercise of delegated legislative power, because it was the authorized act of the people, to determine an event, upon the occurrence of which, the Legislature had enacted that a certain result should follow; and that result was neither creative nor destructive of the law.

That the Legislature can pass a law to take effect upon condition, or upon the happening of a future event, certain or contingent, no one will deny. That it can create such contingency is equally true. The vote of the people operates to bring about the contingency precisely as every combination of causes conduces to an effect. It did not operate *directly* upon the law, to construct or enact it, or to bring it into action, and this is of the essence of a legislative power which cannot be delegated. Any thing short of such direct action is not *law making* action, and is not within the inhibition of the Constitution.

The same observations that have been made respecting the form of the ballot, are equally applicable to the terms used in creating this contingency. These are, "this act shall be submitted to the electors of this State for their approval or disapproval," &c.; but before it can be maintained from these words that legislative power was delegated, it must be established that the Legislature had power to approve of its acts after they have received the executive sanction; and further, that the consequences of the popular vote must be final upon the act to create or annul it. But neither of these propositions can be maintained, for the Legislature does not approve; and the provision that the act absolutely becomes operative, irrespective of the result of the popular vote, shows

that the usual consequences of non-approval could not result from the popular action.

We have been referred to the case of Bartow *vs.* Himrod, recently decided in the Court of Appeals of New York, as authority to show that the present is not such a contingency as the Legislature had power to create, and in my judgment the opinion in that case furnishes the strongest argument to maintain that position, which has come under my observation. The want of analogy between the law under considertion in that case and the present, is too striking to need demonstration.

But the reasoning in that case has failed to convince me that upon the grounds assumed in the opinion, the law of that State was unconstitutional; and I cannot see how, by the most ingenious sophistry, they can be made applicable to our act. In that case it is admitted that a valid statute may be passed to take effect upon the happening of some future event, certain or uncertain, but it is claimed that such statute, when it comes from the hands of the Legislature, must be a law *in præsenti*, to take effect *in futuro*.

Wherein does our act fall short of this? If it is perfect in its details, such is necessarily the case. This has already been sufficiently discussed. But it is assumed in that case, that the popular vote upon the expediency of a law, is not such a future event as the statute can be made to take effect upon. Conceding this to be true, and I shall not stop to discuss the proposition, it must yet be established that the question of expediency was the direct subject matter of the vote, before its force can be felt.

It is not enough that it is a concomitant; that it necessarily attends or even influences that vote, if it be not the subject matter submitted to the arbitrament of such vote. The question of the expediency of a law, it is said, is one for the Legislature, and the event in which a law may be made to take effect, must be such as in the judgment of the law-

52

makers affects such questions. This I am willing to concede, but who is to determine what in the judgment of the Legislature did affect this question, or to demonstrate that the result of the popular vote upon the real question submitted did not? Who can say that upon the question of expediency the Legislature did not exercise its own judgment, and definitely, and finally? Is it to be assumed that the law-makers refused to exercise that judgment, because in the performance of an act enjoined by the law, the subject of expediency might also pass under the judgment of the people?

I can never admit the proposition that the expediency of a law may not, in the judgment of the law-makers, depend upon popular action, with which the exercise of reason and judgment is inseparable.

Because man thinks, is the event dependent upon his action of less validity in law than an event dependent upon the accidents of matter or the occurrence of chance? What limitation the Constitution imposes upon the power of the Legislature to create *contingencies*, I am at a loss to determine. The line which defines the boundary between constitutional and unconstitutional *contingencies*, is a shadowy line which no man can trace; it rests in doubt and uncertainty alone. To declare the law unconstitutional upon such grounds, is to give to our doubts a potency equivalent to other people's certainties.

But it was urged that if the law was to take effect after the popular vote, it was not in force before such vote, and therefore such vote was unauthorized to determine the event, but was in fact an enactment of the law. What was the law which was postponed until after such vote? It was the rule of conduct prescribed to the citizens.

The popular vote was to precede the operation of this rule; it was an event contemplated, necessary to the determination of the contingency. It did not enter into the mandatory or prohibitory clauses of the act; and it was these which were postponed.

A review of the whole act, in the light of the Constitution, requires a construction which shall harmonize the two, if possible.

This may be done by construing the law as if the provisions respecting the contingency were not included in the clause relative to the time when the act should take effect, leaving that to the control of the constitutional rule. Indeed I see not how any other construction can be given consistently with the long recognized practice of Legislatures, respecting laws to take effect upon a future event, for the occurrence of which, provision was made in the act itself, nor how this objection, if valid, would not render every such act invalid. The fair construction of the act, then, is that it should take effect like any general law, but that its sanctions and penalties should be suspended until the happening of the contingency contemplated, or the fixed period prescribed as the event, should determine.

It is said that this is no contingency, because the validity and binding efficacy of the act is made to depend upon the popular vote.

This assumption is not true in fact, as I have attempted to show. The formulary of words used upon the ballot is not to determine the effect of the vote contrary to the expressed will of the Legislature. That will is, that it shall operate upon a contingency of its creation. How then can it be maintained that the event which determines such contingency gives validity and binding efficacy to the law? Without the affirmative popular vote, it is true, that until the arrival of the other period of time fixed by the law for it to take effect, the law is inert, and so is every law which is to become operative upon the happening of a contingency, inert until such event puts it in operation. Its innate force exists, but is dormant until called into activity by the occurrence of a contingency, or the arrival of the period beyond which such inactivity cannot extend.

Where do we seek for the authority, the validity, and binding efficacy of this law, but in the act itself? To say that they spring from the ballot box, is to say that no law contains them which does not go into immediate operation.

As well might it be said that the rising of the sun on the ninetieth day after the close of a legislative session infuses into every law which then takes effect, its efficacy and vitality.

The popular vote then is the agency created by the Legislature by which the event was brought about.

It is true, such agency was an expression of the opinion of the people. But it was not an act by which one jot or tittle was added to or subtracted from the law. It could not declare it void, nor breathe life into it, any more than the proclamation of the executive which succeeded. It did not fix the time when it became an operative law; that was prescribed by the law itself. Indeed, it requires a subtilty of reasoning beyond my comprehension, to demonstrate how a law, by authority of which such vote was cast, and such event determined, can be dependent for its enactment upon such vote. It requires power equal to the task of establishing that the creator derives existence from the created to do this.

How a contingency which is dependent upon the exercise of judgment and intelligence is less within the creative power of the Legislature, than one which depends upon blind chance, or the occurrence of uncontrollable events, although often asserted, has never been demonstrated.

Wherein the operation of mind is less a means which may be employed by the Legislature to determine an event than the operation of matter, is a question too subtle to be comprehended, and until the creation of such a contingency can be clearly demonstrated to be incompatible with the Constitution, I fear "we shall be justly chargeable with wandering from the sphere of the judicial department were we by subtle elaboration of abstract principles and metaphysical doubts

and difficulties, to endeavor to show that such power may be questionable, and on such unstable and injudicial ground to defy and overrule the public will as clearly announced by the legislative organ."

DOUGLASS, J.

This is an action for debt, to recover the penalty for selling ardent spirits, prescribed by " an act prohibiting the manufacture of intoxicating beverages, and the traffic therein," approved February 11, 1853. (*L.* 1853, *p.* 100.) The offence is alleged to have been committed on the 19th day of December last, and the question presented is, whether at this time those provisions of the act which prescribed the penalty, and the mode of recovering it, were in force.

The 18th, 19th and 20th sections of the act, provided that a vote of the electors of the State should be taken, at the time and in the manner prescribed ; and that in case a majority of the votes cast at such election should be in favor of its adoption, the " act should become a law of this State from and after December 1, 1853." If against its adoption, it " should take effect and become a law of this State from and after March 1, 1870." An election was held in June last, in pursuance of these sections, and resulted in a majority in favor of the adoption of the law. If the act is in force, (except the sections mentioned,) it took effect as a law, in virtue of this popular vote, on the 1st of December last.

We are of the opinion that it never has been constitutionally put in force.

In establishing a government, the will of the people is sovereign. They may organize such government, invest it with such powers, confer these powers upon such agents, or reserve them to themselves, as they may deem most conducive to their own welfare. But when they have adopted a written constitution of government, all, collectively as well as individually, are bound by it. The various powers of the gov-

ernment must be exercised by those in whom the Constitution vests them, or contemplates they may be vested. No act of government can emanate from any other source, not even from the people themselves. The people have such control over its action through the right of suffrage, or otherwise, and such right to participate in the exercise of its sovereign powers as they reserve to themselves, and no other.

The Constitution of 1851 vests the legislative power in this State in a Senate and House of Representatives. (*Art.* 4, *sec.* 1.) This article confers the entire supreme legislative power upon these two bodies, except in a single instance. Art. 15, sec. 2, declares that no Banking law shall have effect until approved by a majority of the electors of the State. In this instance, the people have reserved legislative power to themselves. All other legislative power in this State must be exercised by the Legislature, or by those to whom they have constitutionally delegated it.

The Legislature may delegate this power in those cases where the Constitution authorizes and contemplates it, and in no other. All our American constitutions, State and Federal, contemplate, or expressly provide for, local self-government. They go upon the principle of leaving matters of purely local concern to the control of those directly interested. Counties, townships, cities and villages, with powers of local legislation, have always existed among us.

Our forefathers brought with them from the mother country, these municipal institutions, which have performed so important a part in the development of modern civil liberty, by preventing the centralization of power. Their existence, in perhaps every State, has preceded the adoption of written constitutions. All those constitutions assume their existence, and contemplate that they will continue to exist, and may fairly be held to imply that the ordinary powers of legislation with which they have always been vested, may, as occasion shall require, be conferred upon them.

Our own Constitution provides that counties and townships shall be bodies corporate, *with such powers and immunities as shall be prescribed by law.* Art. 10, sec. 1; art. 11, sec. 2, and art. 4, sec. 38, declare what is clearly to be inferred from numerous other provisions, that the Legislature may confer upon organized townships, incorporated cities and villages, and upon the Boards of Supervisors of the several counties, such powers of a *local legislative* and administrative character, as they may deem proper. Powers of local legislation, then, may be delegated to these municipal bodies, because it is authorized, and, as we conceive, for no other reason. And in the case of townships, cities and villages, the fundamental law being silent on the subject, these powers may be vested in the people of these bodies, or in persons chosen by the people. This is a matter in the discretion of the Legislature. Whether, in any case they can be vested in the people of a county, instead of the Board of Supervisors, in this State, it is unnecessary to determine. Probably they may; certainly so in those States whose constitutions designate no persons within the county, upon whom such powers are to be conferred.

But even in the cases referred to, only powers of legislation over matters of local concern, can be delegated. If the Legislature should attempt to invest the Boards of Supersors with power to enact the *entire* civil and criminal codes which should be in force within their respective counties, this would manifestly be in violation of the true intent and spirit of the Constitution. (*Rice* vs. *Foster*, 4 *Harr. Del.* 479; *Parker* vs. *Commonwealth*, 6 *Barr.* 509. But see, also, *Bancroft* vs. *Dumas*, 21 *Verm.* 456.)

That the Legislature may confer upon others, in their discretion, *administrative* powers necessary or proper for carrying on the government, not otherwise vested by the Constitution, and in some cases involving the exercise of a discretion which the Legislature itself might, but could not conve-

niently have exercised, no one will question. These, how-
ever, are not the law-making powers, and therefore do not
here require particular notice.

*But the power of enacting general laws cannot be delega-
ted—not even to the people.*  There is nothing in the Consti-
tution which authorizes, or contemplates it; nothing in the
nature of the power which requires it; nothing in the usages
of our American government which sanctions it; no single
adjudication of a Court of last resort, in any State, which
affirms it; and such delegation would be contrary to the
intent manifested by the very structure of the legislative
department of the government.

While the power and the responsibility of legislation
remain where the Constitution has placed them, before any
proposed measure can become a law, it must first struggle
for ascendency at the ballot-box, amid the numerous issues
involved in all political contests.  It must pass through the
ordeal of public and deliberate discussion in the Legislature.
It must receive the sanction of the concurrent votes of a ma-
jority, or, having been returned with the Governor's veto, of
two-thirds of the members of the two Houses of which the
Legislature is composed—votes cast by men who are not the
mere deputies of their immediate constituents, but the repre-
sentatives of the whole people, and bound to act for the gen-
eral good; who are responsible to the people for their action,
and may be held to that responsibility.  Public opinion will
prevail, and pass into public law; but it will be *enlightened,
deliberate, permanent and organically-expressed public opin-
ion.*  It is this opinion alone which the Constitution designed
should govern.  Such a government secures deliberation
and responsibility in legislation, and affords protection
against the despotism of official rulers, on the one hand, and
of irresponsible, numerical majorities, on the other.  It has
been appropriately termed "the flower of modern civiliza-
tion."

But if the Legislature may transfer this power and this responsibility to the people, where are the checks which the Constitution intended to provide against hasty and inconsiderate legislation? Where are the securities against arbitrary and irresponsible power? We may be subjected to the dominion of the popular majority of the hour—a majority whose opinion *must* be formed without legislative discussion or deliberation—a majority responsible to no one, because it has no superior—impatient of restraint, because conscious of its strength, and apt to think itself infallible, and against whose resistless will thus exercised directly on matters of legislation, with an elective judiciary, all the restraints which the Constitution has imposed upon legislative power, will, in the end, prove utterly unavailing. In short, if this power may be delegated to the people, then, by the action of one of its departments, this *representative* government may be transformed into a collective democracy—the only such democracy practicable where the people are too numerous to assemble. *en masse*, namely, a democracy in which a select body propose the laws, and the people adopt or reject them. No such revolution can be effected in the nature of this government without either a change or a violation of the Constitution.

The Legislature, then, cannot delegate power of legislation in reference to the general laws. On this point, it is believed that the members of this Court are all agreed. We are not aware that any jurist in this country has ever expressed a different opinion.

Nobody makes a question that the act of Feb. 12, 1853, is a general law. If so, it is clear that it is not now the law of this State, unless made so by the Legislature, in whom the power of legislation in reference to general laws is exclusively vested.

We are of the opinion that, although it may be a valid act to take effect in 1870, the Legislature have never yet put it in force, and that sections 18, 19, and 20, and the popular

vote under them, are void, because an attempted delegation to, and exercise of legislative power by the people, in violation of the Constitution.

As one half the members of this Court do not concur in this opinion, we must be pardoned if, in order to make our views more clearly understood, we recur to principles and definitions somewhat elementary in their nature.

All power proceeds from, and its exercise implies the exertion of *intelligent will.* Its different kinds are distinguished by the nature of the end which this *will* is exerted to accomplish, and of the discretion which its exertion implies. Legislative power is the power of *prescribing* rules of civil conduct, or in other words, of *enacting* laws. Its possession imposes the duty of judging what laws are expedient, and what are inexpedient. Its exercise consists in the expression of will as to what laws shall be in force, founded upon this judgment. "A statute," says Chancellor Kent, "is the express written will of the Legislature, rendered authentic by certain prescribed forms and solemnities." (1 *Kent Com.* 447.) Its enactment always implies the judgment of the Legislature that it is expedient. There certainly can be no statute law which is not the will of the law makers, implying this judgment as to its expediency, and every expression of this will, implying this judgment, which is the proximate cause of an obligatory rule of civil conduct, is clearly an exercise of legislative power.

Now, when the Legislature make the taking effect of an act depend upon the approval or disapproval of others, what is the nature and effect of their action? They do not themselves *will* that the act shall become a law, but merely that it shall be referred to the will of others to determine whether it shall become a law or not. Their action does not imply their judgment that the law would be expedient, but merely that it is expedient to refer the question of the expediency of the law to the judgment of others. They do not, therefore,

exercise the power and the discretion necessary to enact the law, or, in other words, to make it an operative rule of conduct, but they confer upon others identically the same power, and impose the duty of exercising the same discretion which they themselves would have exercised if they had enacted t. They merely propose a law to be adopted or rejected by others.

This seems to us most clearly, a delegation of legislative power. Probably no doubts would ever have arisen on this subject, were it not for the indirect manner in which the delegation is made. But there is obviously no difference in principle between making the taking effect of an act depend upon the approval or disapproval of others, and conferring in express terms the power of legislating on the same subject. The only difference there can be, is in the extent, not in the nature of the power delegated. Thus, if the Legislature should pass an act prescribing the manner in which the streets of Detroit should be paved, and make its taking effect depend upon the approval of the Common Council, this mode of legislation would confer upon the Common Council power of the same nature as that which would be conferred by an act authorizing them to prescribe the mode of paving streets.

The only difference in the two cases is, that in the former the power of the Common Council is limited to the adoption or rejection of a law proposed to them; in the latter they are at liberty to adopt whatever law they choose on the same subject. Again, by the common law, which prevails in most of the States, the owner of cattle running at large is liable for any damage which they may occasion to others; but it is sometimes expedient that a different rule should prevail in particular townships, owing to peculiar circumstances. Suppose, this being a general law, the Legislature should pass an act declaring that cattle might run at large in a particular township, without such liability of the owners, to take effect

on a vote of the people of the township in its favor. Such a law would .confer on the people substantially the same power as a law authorizing them to enact a by-law to the same effect. And most clearly the latter would delegate power of local legislation.

Legislative power may be conferred upon small bodies, like the Common Council of a city, or the people of a township, in either of the modes referred to; but it is obvious that the only practicable mode of delegating it to the people of a county, or of the whole State, is by legislative acts to take effect upon their approval; for the people, either in county or state, are too numerous and too widely dispersed to assemble *en masse* and act as a legislative body. They can only exercise legislative power by adopting or rejecting laws proposed by the Legislature, who alone can invest them with the forms and solemnities by which laws must be authentica-ted. It is for this reason that the people reserved to themselves legislative power in reference to banking laws, in the only way they could reserve it, when they provided in the Constitution that no such law should *have effect* until approved by a majority of the electors of this State.

We are now prepared to examine the act under consideration. No one will contend that it is a law of this State, except so far as it expresses the *will* of the Legislature, and is not in conflict with the Constitution.

But it does not express their will that any of its provisions, except sections 18, 19, and 20, should take effect before 1870 ; nor do its enactments imply their judgment as to the expediency of its taking effect at an earlier period. It might have passed the Legislature in its present form, although every member thought it inexpedient that it should become a law. The sections mentioned, provide for taking a vote of the people upon the question, whether or not the act should take effect at an earlier period. namely, on the 2d of December, 1853, and declare that it should then become a.

law, if a majority of the votes cast should be in favor of it. The vote of the people expressed their will and their judgment, that it was expedient that it should become a law of this State on the day last mentioned.

If the act (except the sections mentioned) is now in force, who exerted the power which put it in force? Certainly not the Legislature. They merely clothed it with the forms and solemnities, by which laws must be authenticated, and conferred upon the people the power to put it in force in December, 1853. Without the exercise of this power by the people, or some further act by the Legislature, it must have remained without vitality until 1870. Clearly, it is the will of the people, expressed by their votes in June, which has put it in force. And that will was directed to the same end, implied the exercise of the same discretion, and was therefore of the same nature, as the will which the Legislature would have exercised, if, instead of sections 18, 19, and 20, they had enacted these words : " This act shall become a law from and after December 1st, 1853." This was legislative will. The power of putting a law in force by its exercise, was legislative power. The sections of the act which purported to confer it, if valid, delegated legislative power to the people, in the only way in which, as we have already shown, it was practicable to delegate it. And the act, if in force, is so only in virtue of the exercise of this delegated power.

It seems to have been supposed by some, that the constitutional objection which might exist, to a submission of the question, whether the act should take effect at all, might be evaded by submitting the question, whether it should take effect at one or the other of the two periods of time, separated from each other by an interval of seventeen years. But there is obviously no difference in principle between the two cases. The determination of the latter question would just as clearly be an act of legislation, as the determination of the

former.  We do not understand the counsel for the people to insist, or any member of this Court to be of the opinion that there is any distinction between them.

Indeed, the former was the real substantial question submitted by the act of 1853.  No great respect is due to the sophistry which dictated the form of it, and which assumes that a constitutional objection to an unqualified submission might be evaded by submitting the question, whether an act should become a law presently or in the next generation. Obviously, the same result would be accomplished by the one mode of legislation, as by the other.  It is the thing done, and not the mode of doing it, which is material.  A Constitution which could be evaded by such a subterfuge, would scarcely be worth the paper on which it is written.

The conclusions at which we have arrived, namely: first, that the power of legislation in reference to general laws is vested exclusively in the Legislature, and cannot be delegated; and secondly, that the taking effect of such laws cannot be made to depend upon the result of a popular vote upon the question whether or when they shall take effect, because this would be a delegation of such power; from which it necessarily results, that the act in question has never yet been constitutionally put in force;—are fully sustained by the decision of the Supreme Court of Delaware, in Rice *vs.* Foster, (4 *Harr. Del. R.* 477;) of the Supreme Court of Pennsylvania, in Parker *vs.* the Commonwealth, (6 *Barr.* 509;) decisions of the different Supreme Courts in New York, only one of which, Bradley *vs.* Baxter, (*Am. Law Reg., Sept.*, 1853,) is yet reported, and finally, by the unanimous decision of the Court of Appeals of that State, in Bartow *vs.* Himrod, decided in July, 1853.  The New York law involved the question of the validity of the School Law of that State, which was submitted to the people for adoption or rejection, and no attempt has been made to distinguish them from the case before us.  The same views were expressed by Stuart,

J., in delivering the opinion of the Supreme Court of Indiana, in Maze *vs.* The State, decided in November last, but they were not necessary to the determination of the case then before the Court. Such weight of authority against the validity of a species of legislation which all know is of recent origin, could scarcely be expected, and if the case before us were far less clear upon principle, than it is to our mind, we should hesitate long before we ventured to dissent from the views of the eminent jurists who have preceded us in the consideration of this subject.

There is but one contrary decision, and that is in the case of Johnson *vs.* Rich, (9 *Barb. S. C. R.* 680,) decided by the Supreme Court of New York, for the 7th District—three judges being present, and one dissenting; and the case has been overruled by the Court of Appeals, in Bartow *vs.* Himrod, already referred to.

In The People *vs.* Reynolds, (1 *Gil.* 1;) The Commonwealth *vs.* Quarter Sessions, (8 *Barr.* 391,) and The Commonwealth *vs.* Painter, (10 *Id.* 214,) laws special and local in their nature, which were made to take effect upon the vote of the people of the counties or townships interested, were held valid. Perhaps these cases were all correctly decided, upon the principle we have already explained at some length, that powers of local legislation may be delegated. We concede, however, that the Courts by whom they were respectively decided, do not place them distinctly upon this ground, but rather upon the ground that the power conferred in each case was administrative and not legislative in its nature.

Whatever explanation may be given to them, one thing is certain; they expressly concede that general laws cannot be made to take effect upon the result of a popular vote. This concession is distinctly made in The People *vs.* Reynolds, and the two remaining cases were decided by the same Court which had previously decided Parker *vs.* The Commonwealth,

with the express avowal that it was not the intention to over-rule it.

Not only are the conclusions to which we have arrived in accordance with the almost unbroken current of authority, but they are consistent with all the established usages of leg-islation. We are not aware that in a single instance a gen-eral statute has been acquiesced in as valid, which was made to take effect upon the exercise by others of the same will and discretion the Legislature would have exercised if they had made its taking effect unconditional, and which conse-quently, in our view, delegated legislative power. Most, if not all, of the instances of this kind of legislation to which we have been referred, were laws relating to matters of local concern, made to take effect upon a vote of the people of a township or county in their favor, and in our view valid, not because legislative power was not delegated, but because in those cases the Legislature had authority to delegate it. Many other instances referred to were laws which, as they came from the hands of the Legislature, were valid enact-ments, in the nature of *propositions*, and the popular vote was a mere acceptance of the terms proposed, (like the accept-ance of an act creating a private corporation,) and therefore not an exercise of legislative power at all. Such was the vote of the Convention upon which the admission of this State into the Union was made to depend, by the act of Con-gress of June 15, 1836. An attempt to refer to the various laws cited would lead to great prolixity. There is one in-stance, however, of what may be termed general legislation, which requires notice. It has been urged that upon the principles we maintain, the Constitution of 1851 has never been adopted, for the Convention which framed it, submitted it to the people to determine whether it should take effect or not. If the Convention had power to enact the Constitution at all, without submitting it to the people, *which may well be*

*doubted,* we are clearly of the opinion that they were authorized to delegate this power to the people, and most unquestionably they did so by the submission, for certainly it was the people who made it the fundamental law. There was nothing in the Constitution of 1836, or in the nature and objects of the Convention, inconsistent with such a submission. That Constitution merely provided for the calling of a Convention, when two-thirds of each branch of the Legislature should think a revision necessary, and a majority of the people voted in favor of it, but did not prescribe the powers or duties of the Convention when called. It did not provide that *the power of revision should be vested in the Convention.* (*Art.* 13, § 2.) And as Constitutions are always in theory the direct expression of the will of the people, and in nearly every instance in this country have been adopted by them, there can be no doubt that the submission of the present Constitution to the people was in entire accordance with the true intent of the Constitution which it superseded.

Those of our brethren who are of the opinion that the law in question is now in force, concur in the views expressed by the Court in the overruled case of Johnson *vs.* Rich, before cited. They hold that an act may be made to take effect upon the happening of any future event, certain or contingent; that when such an act takes effect it does so in virtue solely of the will of the Legislature, which prescribes the event and its *power,* and therefore no legislative power is delegated. And they are of the opinion that this was a valid statute, to take effect upon the happening of a future contingent event, namely, the result of a popular vote.

Unquestionably, no legislative power is conferred by an act, the taking effect of which was made to depend upon the happening of some future event, which is a mere change of circumstances, upon which the expediency of the law, in the judgment of the law-makers, depends—such as a change of

the seasons, or a hostile invasion. For, in such a case, most clearly the will of the Legislature puts the law in force. No other will is exerted to that end. The event is the mere *occasion,* not the *cause* of its coming into effect. The Legislature do not refer it to others to determine whether it shall become a law or not. And on the question of the expediency of the law, they exercise their own judgment, definitely and finally. They do not appeal to others to judge for them as to its present or future expediency. They exercise the will and the discretion which, in the case of general laws, the Constitution makes it their duty to exercise. No legislative power is conferred by those provisions of the act which prescribe the event, and make it the occasion of the taking effect of the law, (it is absurd to speak of prescribing the *power* of such an event,) *because* the event implies no exertion of *intelligent will in determining whether it shall take effect or not.*

But where the taking effect of an act is made to depend upon a future event, which, like the popular vote in this case, is a mere exercise and expression of the same will and the same judgment, as to the expediency of the law, which the Legislature would have exercised, if they had enacted that the law should take effect unconditionally, at the time specified, how can it be said that the law comes into force in virtue of the will and the judgment of the Legislature? The event itself is an exercise of the will of the people, which determines the very question whether the law shall take effect or not. How can it be said that the Legislature determines it? We trust we have already shown that it is the will of the people, and not of the Legislature, which makes the act a law; that the people, and not the Legislature, decide as to its expediency; and that *because* the event itself is a mere exercise of Legislative will and discretion, those provisions of the act which "prescribe the event and its power," dele-

gate legislative power. That reasoning which overlooks the wide distinction between the making an act to take effect upon the happening of an event which is, and one which is not, a mere exercise of legislative will and discretion, and infers that because legislative power is not delegated in the one case it is not in the other, is surely fallacious.

Unquestionably it is true, that the Legislature may enact a valid law, to take effect upon the happening of any future event, certain or contingent, which does not involve the exercise by others, of that legislative will and discretion, which they cannot constitutionally delegate to them the power of exercising. Thus far the doctrine that laws may be made to take effect upon future events extends, and no farther.

Finally, if it is true, as all *concede*, that power of legislation, in reference to general laws, cannot be delegated to the people, *because*, if this were so, by the action of one of its departments, this *representative* government may be transformed into a *democracy*, in which the Legislature merely propose the laws, and the people adopt or reject them: then is it not clear that the act in question is not constitutionally in force? For, call it a law to take effect upon a contingency, or a law delegating legislative power—call it what we will, this is certain, that in substance and effect, it was merely proposed by the Legislature, and, if their vote had any validity, adopted by the people.